In the Matter of the Arbitration between KNICKERBOCKER TEXTILE CORPORATION and SHEILA-LYNN, INC.

Supreme Court, Special Term, New York County, December 20, 1939.

*Henry I. Fillman*, for the motion.

*McLanahan, Merritt & Ingraham* [*Robert R. Bruce* of counsel], in opposition.

COLLINS, J. Sheila-Lynn, Inc., moves to vacate the unanimous arbitration award in favor of Knickerbocker Textile Corporation, on the grounds (1) that there was evident partiality on the part of one of the three arbitrators, and (2) that such arbitrator was guilty of misbehavior which prejudiced the rights of Sheila-Lynn.

The motion poses an important and uncommon question in the law of arbitration. Important, because the invocation of the machinery of arbitration is encouragingly increasing and the issue here bears significantly on the proper conduct of arbitrators; novel, inasmuch as no precise New York pattern for this case has been offered.

The facts are free from entanglement; no dispute concerning them is presented.

Differences having arisen between the parties over a contract for the sale of fabric, arbitration was resorted to under the *ægis* and rules of the National Federation of Textiles, Inc. Each party designated an arbitrator and the two thus chosen selected the third, Ellis Arnoff, whose alleged partiality and misbehavior constitute the foundation for this proceeding. Any two could have rendered a binding award. The arbitration proceeding was initiated on October 14, 1938, and Arnoff was notified of his selection on or about October twenty-seventh. After taking testimony, a unanimous decision was made on November 11, 1938, in favor of Knickerbocker for $9,891.70, and Knickerbocker was required to cancel the undelivered portion of the goods purchased by Sheila-Lynn under the contract. Sheila asserts that Knickerbocker's victory was complete; Knickerbocker counters that its victory was but partial. Sheila paid the award on November 21, 1938, and Knickerbocker made the cancellation of the remainder of the goods.

On February 10, 1939, this proceeding was instituted on the basis that on January 9, 1939, Sheila discovered that in an arbitration between American Silk Mills, Inc., and Shirley Silk Co., Inc., of which latter company Arnoff was and is treasurer, Jacob Granowitz, Knickerbocker's president, was designated by the Shirley Company as its arbitrator. The American Silk Mills-Shirley Silk Co. arbitration was commenced September 13, 1938, the hearing therein occurred on October 24, 1938, and on the same day a two to one award was made in favor of Shirley, Granowitz being one of the majority. Thus, three days after Granowitz had decided an

arbitration proceeding in favor of Shirley, of which Arnoff was treasurer, Arnoff received notice of his selection as an arbitrator in a proceeding to which Knickerbocker, Granowitz's concern, was a party. Granowitz decided for Arnoff's Company and Arnoff, in turn, decided for Granowitz's.

It is not contradicted that there was no disclosure of Granowitz's participation in the other arbitration proceeding prior to January 9, 1939. Nor is it disputed that Sheila-Lynn had no knowledge of such participation prior to that time.

Naturally enough, Arnoff disavows any bias, undue influence or other improper conduct. He affirms: " The fact that Mr. Granowitz, President of Knickerbocker Textile Corporation, had been an arbitrator in my company's case with American Silk Mills, Inc., in no way affected my judgment in the present matter. The award was unanimous. In signing the award with my co-arbitrators, Burgess and Sondheim, I did what I believed to be fair and just under the evidence as presented to the Arbitration Board. I was not influenced by any extraneous considerations in reaching that decision."

For the purpose of the discussion we shall accept the disclaimer of Arnoff at its face value. We shall assume, too, that the award was justified by the evidence. The merits of the award, however, are not presently in issue.

The principle involved is broader than the correctness of the arbitrators' decision. The concern here is with policy rather than expediency; with the fundamental spirit and objective of the law rather than a punctilious adherence to its letter.

Assuming that both sides have stated the truth, what then?

But let us address ourselves first to the preliminary objection which Knickerbocker interposes — that the motion to vacate comes too late. Under section 1463 of the Civil Practice Act, " Notice of motion to vacate * * * an award must be served upon the adverse party * * * within three months after the award is filed or delivered."

The award here was delivered on November 12, 1938, and the motion papers were served on February 10, 1939. Plainly, then, the motion comes within the three-month period, and the preliminary objection is rendered invalid.

Nor does the circumstance that the award was paid before discovery of the facts which animate the motion halt the step here taken. In *Matter of Friedman* (215 App. Div. 130) it was said (at p. 137): " I do not believe that the appellant waived his right to move to set aside the award by cashing the check sent to him by the arbitrators accompanying their award. In the first place, the award was absolutely void. It was more than voidable."

Arbitration is a salutary device. That it has become increasingly valuable and popular is explicable. It is a time and expense economizer. It relieves the courts. It is simple, expeditious and free from the myriad technicalities which beset and protract litigation. Its decisions possess a finality not inherent in lawsuits. It is a business-like method of resolving differences. Ergo, arbitration is to be encouraged. Arbitration awards should not be disturbed for trivial, captious or technical reasons; the causes must be cardinal. (*Matter of Wilkins*, 169 N. Y. 494; *Matter of Goff & Sons, Inc.*, v. *Rheinauer*, 199 App. Div. 617; *Itoh & Co., Ltd.*, v. *Boyer Oil Co., Inc.*, 198 id. 881.) But just because the practice is increasingly common, and just because arbitration awards have a sense of absolutism, the more scrupulous should be the conduct of arbitrators.

The doctrine is admirably stated by the First Department in *Matter of Friedman* (*supra*, p. 136) thus: " During recent years arbitration has been more and more resorted to for the settlement of business controversies. It, therefore, becomes of the utmost importance that in statutory proceedings of this character where the rights of parties are adjudicated, not by trained lawyers and judges, but by fellow-businessmen, every safeguard possible should be thrown about the proceeding to insure the utmost fairness and impartiality of those charged with the determination of the rights of the parties. Nothing should be permitted to throw suspicion even upon the entire impartiality of arbitrators. The finality of an award of arbitrators as compared with the reviewable decision of a judge or a referee makes this all the more important, and that the tribunal which is to pass upon the rights of the parties be not subject to the slightest suspicion as to its fairness."

Granowitz's opposing affidavit declares: " In the silk and rayon industry the practice of arbitrating disputes under the arbitration rules of the National Federation of Textiles, Inc. and its predecessor, the Silk Association of America, Inc., has been established for many years. It has been the custom in the industry to select arbitrators from among the heads of the various concerns engaged in the industry and its affiliated branches. Thus it is not unusual for an arbitrator to serve on cases where both parties and arbitrators are connected with concerns with which the arbitrator or his company have done or are doing business, or whose officers have been arbitrators in cases involving his company. Such inter-relationships are inevitable because of the method of arbitration used in the industry, and they have never been regarded as a basis for disqualifying an arbitrator in the absence of any showing that the arbitrator was actually biased."

There is force and cogency to Granowitz's argument; but it is far from conclusive.   To be sure, proof of business relations between parties and arbitrators, standing alone, is not sufficient to vitiate an award.   (*Matter of Meinig Co.* v. *Katakura & Co., Ltd.*, 241 App. Div. 406; affd., 266 N. Y. 418; *Matter of Newburger* v. *Rose*, 228 App. Div. 526; affd., 254 N. Y. 546; *Matter of Gwalter & Co., Inc.*, v. *Lawrence Textile Corp.*, N. Y. L. J. May 20, 1932, p. 2834; affd., 238 App. Div. 779.)

But this situation goes beyond that of mere business relations. Here we have an additional question: was Arnoff obliged to reveal his connection with the other arbitration proceeding so as to give Sheila an opportunity to object to his serving as arbitrator?

Before proceeding with the arbitration, the director of the arbitration bureau introduced the arbitrators to the parties and witnesses, and inquired: " Is there any objection to these arbitrators serving on this case or does either party believe that the past, present or future dealings of any of these arbitrators with either of the parties will prevent the rendering of a fair and just award?"

No objection was voiced.   Indeed, ignorant of the facts, Sheila could raise none.   Here was Arnoff's chance to make known the fact of Granowitz's connection with the first arbitration.   Though asked to speak out, he remained mute.

Weaker is the case of *Knice* v. *Hedges* (119 Misc. 1; affd., 205 App. Div. 871), where a verdict was set aside because a juror had concealed the fact that his father had been injured.   It was there pertinently observed: " It was the duty of the juror to have informed counsel of the fact that his father had been injured, although the question may not have been directed to him.   His failure to do so was concealment.   I do not charge the juror with any corrupt act in maintaining silence.   It has been repeatedly held that such conduct was prejudicial to the interests of the defendant.   [Citing cases.]   The motion to set aside the verdict must be granted."

⊦ In according weight to the *Knice* decision I am not overlooking the significant factor that at the time of its rendition a jury's verdict was required to be unanimous.

In *Hesketh* v. *Braddock* (3 Burr. 1847) Lord MANSFIELD said (at p. 1856):

" There is no principle in the law more settled than this — that any degree, even the smallest degree of interest in the question pending, is a decisive objection to a witness, and much more to a juror   *   *   *

" The law has so watchful an eye to the pure and unbiased administration of justice, that it will never trust the passions of

mankind in the decision of any matter of right. If, therefore, * * * the juror or a witness be in any sort interested in the matter to be tried, the law considers him as under an influence which may warp his integrity or pervert his judgment; and therefore will not trust him.

" The minuteness of the interest will not relax the objection. For, the degrees of influence cannot be measured. No line can be drawn, but that of a total exclusion of all degrees whatsoever."

It behooved Arnoff, I think, to make a disclosure. (*O'Brien* v. *Long*, 49 Hun, 80, 82; *Kimberley* v. *Dick*, 13 Eq. Cas. 1.)

Under section 1462 of the Civil Practice Act, " In either of the following cases, the court must make an order vacating the award, upon the application of any party to the controversy which was arbitrated:

" 1. Where the award was procured by corruption, fraud or other undue means.

" 2. Where there was evident partiality or corruption in the arbitrators or either of them.

" 3. Where the arbitrators were guilty * * * of any other misbehaviour by which the rights of any party have been prejudiced."

Note that the statute does not refer to the conduct of a *majority* of the arbitrators.

Some of the general principles governing arbitration are worth recalling.

In the absence of affirmative evidence of fraud, partiality or unfairness, which are never presumed, every intendment is in favor of the award.

That arbitrators are judicial officers and are bound by the same rules as govern such officers, is expressed in *Matter of Friedman* (*supra*, at p. 134) as follows: " The law is well settled that arbitrators exercise judicial functions, and while not *eo nomine* judges, they are, in fact, judicial officers and bound by the same rules as govern such officers. (*Matter of A. E. Fire Ins. Co.* v. *N. J. Ins. Co.*, 240 N. Y. 398, 405.) In *Fudickar* v. *Guardian Mutual Life Ins. Co.* (62 N.Y. 392) it was said (at p. 399): ' The arbitrator is a judge appointed by the parties; he is by their consent invested with judicial functions in the particular case; he is to determine the right as between the parties in respect to the matter submitted, and all questions of fact or law upon which the right depends are, under a general submission, deemed to be referred to him for decision. The court possesses no general supervisory power over awards, and if arbitrators keep within their jurisdiction their award will not be set aside because they have erred in judgment either upon the facts

or the law.' And as was said in *Matter of Fletcher* (237 N. Y. 440, 447), referring to provisions of law with reference to arbitration proceedings: ' These provisions are appropriate to proceedings where parties substitute judges of their own choice for judges chosen by the State in the determination of disputes otherwise cognizable by the courts alone.' "

In *Fortunato* v. *The Mayor* (31 App. Div. 271, 274) it was said: " The courts have again and again stated that the question upon applications of this character was not whether the attorney had been improperly influenced, or whether his conduct had been such as to show prejudice or partiality, but whether from the relationship of the parties or the acts of the referee it was possible that such influence had been exercised, or whether on account of such relationship, or for some other reason, the fairness of his decision could be justly questioned. This question was lately before this court in the case of *Reynolds* v. *Moore* (1 App. Div. 105), where Mr. Justice BARRETT, in delivering the opinion of the court says: ' The real question here was not whether the referee was guilty of actual corruption, but whether the fairness of his decision was justly questioned. *It is the settled law of this State that any indiscreet action of a referee from which improper inferences can be drawn, suffices to set aside his report.*' And the learned justice quotes the remarks of Judge HARRIS in the case of *Rocsa* v. *Saugerties & W. Turnpike R. Co.* (12 How. Pr. 297): ' All agree that the administration of the law must be pure and impartial. But it is scarcely less important that the conduct of those to whom its administration is entrusted should be such as to furnish to those who litigate no just grounds of suspicion;' and the remarks of DAVIS, J., in *Livermore* v. *Bainbridge* (14 Abb. [N. S. ]227): ' The interests of justice demand that the general rules designed to prevent the suspicion of impurity in its administration should be rigidly adhered to.' In the cases cited, as in this case, the integrity of the referee was not questioned. We can say of the referee in this case as was said by HARRIS, J., in *Dorlon* v. *Lewis* (9 How. Pr. 1): ' The referee is a man of the most unquestionable uprightness. None sooner than he would have spurned an attempt improperly to influence his decision. * * * A referee, under such circumstances, owes it to himself not only to avoid all improper influences, but even " the appearance of evil." Whether satisfied with the decision or not, no one should be left, for a moment, to question its *fairness.*' *The question, however, that we are to determine is, not whether this relation that existed between this referee and . the city has influenced his decision, but whether it was such a relation as, under the circumstances, would justify a person in questioning the fairness of the decision.* It seems to me clear that

the relation existing between the referee and this defendant was such that the fairness of his decision upon the questions submitted to him might justly be questioned by a party to the litigation. *The fact that the referee is a man of high character and unquestioned integrity should not be allowed to influence the determination of that question, for it is essential to the administration of justice that even the appearance of evil should be avoided, and where a man who accepts the position of referee has such relations with one of the parties to the litigation as to make it improper that he should decide the questions submitted to him, his character is not at all material and the court will enforce that rule against a man of high character as well as against one whose character is not so good.*" (Italics mine.)

To the same effect: *People v. Haas* (105 App. Div. 119, 123); *McCormick v. Walker* (158 id. 54, 58); *People v. Ibey* (121 Misc. 286, 288); *People ex rel. Union Bag and Paper Corp. v. Gilbert* (143 id. 287, 288).

By reason of his connection with Granowitz, unknown to Sheila, Arnoff, in my opinion, was disqualified to serve as an arbitrator in the arbitration proceeding here assailed. The following language in *Matter of Friedman* (*supra,* at p. 137) is noteworthy: " I am of the opinion that Harry S. Friedman did not receive that impartial consideration to which he was entitled, and that the award which was made should never have been confirmed. In 5 Corpus Juris (at p. 63), the whole matter is summed up: ' The first great requisite as to persons occupying the post of arbitrator is a judicial impartiality and freedom from bias. In undertaking to act as arbitrators they assume a quasi judicial position. It follows, therefore, that the existence of any facts which may operate to affect the impartiality of arbitrators will render such arbitrators incompetent to make a valid award, provided such facts were unknown to the complaining party, and in applying this principle it is not material that the bias arose subsequently to the submission.' "

In *Smythe v. Board of Education* (214 App. Div. 735) it was held: " Orders reversed upon the law and the facts, with ten dollars costs and disbursements, and motion to substitute an arbitrator granted. Without the slightest reflection upon the honesty and integrity of the umpire selected here, we are of opinion that the defendant is entitled to the appointment of an umpire whose acts cannot be criticised upon the ground that he is in fact a friend of the plaintiff."

In *Matter of Albert v. Spiegelberg* (146 Misc. 811, 812) Mr. Justice WASSERVOGEL held that an attorney at law and an office associate of an applicant for an order to compel arbitration is disqualified to act as an arbitrator, and the other parties to the controversy may not be compelled to accept him.

In *Kemp* v. *Rose* (1 Giff. 258, 265; 65 Eng. Rep. 910, 913) the vice-chancellor said:

" The plaintiffs' case is not put on the ground of fraud. It depends on considerations of another kind. The duties to be performed by Mr. Lamb as regarded the plaintiff were of a judicial character. According to the language of the written contract the plaintiff bound himself in the strongest way to abide by the decision of Mr. Lamb, in an absolute confidence that his decision would be that of a wholly unbiased man.

" A perfectly even and unbiased mind is essential to the validity of every judicial proceeding.

" Therefore, when it turns out that, unknown to one or both of the persons who submit to be bound by the decision of another, there was some consideration in the situation of him to whom the decision was intrusted which tended to produce a bias in his mind, the existence of that circumstance will justify the interference of this Court.

" *Whether in fact the circumstance had any operation in the mind of the arbitrator must, for the most part, be incapable of evidence, and may remain unknown to every human being, perhaps even unknown to himself. It is enough that such a circumstance did exist.* * * *

" In the present case the circumstance tending to influence the mind of Mr. Lamb seems, at first sight, to be but small. * * * Without imputing corruption to Mr. Lamb, *it is enough if there was a circumstance tending to bias his judgment which was unknown to the plaintiff.* The power of Mr. Lamb * * * was * * * nearly unbounded; and that being so, if there was the smallest speck or circumstance which might unfairly bias his judgment, his decision cannot be absolutely binding upon the contracting party." (Italics supplied.)

Further illustrations are found in *Baring Brothers and Company* and *Doulton & Company* (61 L. J. Q. B. [N. S.] 704); *Tully* v. *Chamberlain* (Indian Law Reports, 25 Calc. 141); *Hubbell* v. *Herbeck* (54 Hun, 147, 148).

*Matter of Shirley Silk Co., Inc.,* v. *American Silk Mills, Inc.* (257 App. Div. 375), involved the arbitration of Arnoff's Company, above alluded to. That decision restates some of the principles to which reference has been made. As indicated, the award reviewed by the Appellate Division was by a two to one vote. The appellate tribunal designated " an official referee to take proof and report to the Special Term upon the question of the relationship existing between the arbitrator Granowitz and appellant and as to the knowledge of respondent with respect to such relationship." The official referee found that " (a) The arbitrator Granowitz was

entirely impartial and was not disqualified from rendering an award. (b) There was no relationship between the arbitrator Granowitz and the petitioner Shirley Silk Co. Inc." However, the official referee's report is of little significance here because the inquiry before the official referee was restricted and, what is more, here, as distinguished from the *American Silk Mills* case, there *was* a relationship between the arbitrator Arnoff and Knickerbocker; here, because of such relationship, Arnoff *was* disqualified from rendering an award.

I am satisfied that were this a two to one award, with Arnoff on the majority side, the award would indubitably have to be vacated.

We approach, therefore, the pivotal point, which is whether or not the unanimity of the award compels a different conclusion.

There is authority for the rule that although one arbitrator may have acted fraudulently and corruptly, if the other two acted honestly the award must stand. (*Plummer* v. *Saunders*, 55 N. H. 23; *Davis* v. *Forshee*, 34 Ala. 107.) But no New York case upholding this rule has been called to my attention.

The most recent example of the effect of the interest of one of three judges on a unanimous decision is reflected in *Matter of 671 Prospect Ave. Holding Corp.* (97 F. [2d] 513). There Judges MANTON, SWAN and CHASE, of the Circuit Court of Appeals, unanimously decided a case in which it subsequently developed one of the judges was financially interested. This circumstance induced a recall of the unanimous decision, Judges SWAN, A. N. HAND and PATTERSON noting: " Since it appears without contradiction that one member of the court was disqualified at the time of the hearing of this appeal, the motion is granted and it is ordered that the mandate of this court be recalled, the decision be vacated, and the case be placed upon the docket for reargument upon the original briefs."

On the reargument the court unanimously reversed itself (105 F. [2d] 960, 961), remarking: " This appeal was before us at a prior term of court and an opinion was rendered, which is reported in 2 Cir., 97 F. 2d 513. At the current term a motion was made by the Trustee in Bankruptcy to vacate our decision, recall our mandate, reinstate the appeal and grant a reargument on the ground that one of the judges who participated in the former decision was disqualified by personal interest. This motion was granted and the case has been reargued upon the original and supplemental briefs."

In an early New York case (*Oakley* v. *Aspinwall*, 3 N. Y. 547) a reargument was ordered in a case where one of the participating judges was disqualified, even though there was a waiver. Elucidating the meticulosity with which such delicate situations are treated, the court said (at p. 552): " It is the design of the law to maintain the

purity and impartiality of the courts, and to insure for their decisions the respect and confidence of the community. Their judgments become precedents which control the determination of subsequent cases; and it is important, in that respect, that their decisions should be free from all bias. After securing wisdom and impartiality in their judgments, it is of great importance that the courts should be free from reproach or the suspicion of unfairness. The party may be interested only that his particular suit should be justly determined; but the State, the community is concerned not only for that, but that the judiciary shall enjoy an elevated rank in the estimation of mankind."

In 6 Corpus Juris Secundum (§ 104, p. 249) the rule is given thus: " Where there are several arbitrators, partiality or misconduct on the part of one only who acts with the others is ground for setting aside the award, although it was unanimous, and although an award by the others alone would have been valid."

The Corpus Juris pronouncement is based on the provocative and luminous case of *Moshier* v. *Shear* (102 Ill. 169) where a unanimous arbitration award was vacated because one of the arbitrators, Hubbell, had spoken to Stephens, an arbitrator in a previous set-aside arbitration of the same matter. Some of the observations of the court there are so apposite here that they bear quoting. It was said (at p. 173): " After being selected, it is the duty of an arbitrator, like a juror, to act fairly and impartially between the parties and on the evidence adduced before them on the trial, and entirely independent of all outside influences, and what will be misconduct on the part of a juror will, as a general rule, be such on the part of an arbitrator." And the court added (at pp. 174–176):

" It is true that there is no positive proof that the arbitrator was influenced in his opinions by the conversation, but we have no reason to expect such proof in such cases. However much he may have been influenced, it is scarcely probable that he would be aware of the fact. Such effects are seldom perceptible or consciously produced. They are usually imperceptible, and unknown to the subject of their influence. However honest and upright Hubbell may be, and however he may feel free from influence produced by his conversation with Stephens, still it is almost impossible to believe that such a conversation with a friend of long standing, and for whom the arbitrator had a high regard, did not produce strong, if not controlling, convictions on his mind, and *however desirable it may be to terminate protracted contention, it is more desirable that justice shall be administered, free from all improper or corrupting influences,— that the mode of settling contests by arbitration shall be kept pure, and free from improper influences.* Here, whatever the

motive of the arbitrator, he was subjected to improper influences, and whether or not it operated to the injury of plaintiff in error, it was calculated to operate to the prejudice of the parties, and *to sanction it would form a dangerous precedent.* We can not know what influence it may have exerted in this case. *It is sufficient that it was calculated to produce improper results.*

" *To sustain this award would be to sanction and justify the means by which the whole system of arbitration would be perverted and corrupted. If we hold that the party thus objecting must prove that undue influence actually resulted, then the objection would seldom be available, however corrupt the influence.* Such things can seldom, owing to precautions taken by those engaged in such practices for concealment, be shown by positive evidence, hence *the safer rule is, to hold that when it appears there has been conduct calculated to result, and which has probably resulted, perniciously, to set aside the award.* It is clear that had Shear done what Stephens did, or had he procured another to do the same thing, there could not have been the slightest hesitation in setting aside the award, and yet the influence of Stephens was equal to, if not more potent than that of Shear would have been, on the mind of the arbitrator, who was his intimate friend, and whom he held in high esteem. What more powerful influence could have been exerted? If we sustain this award we shall license every person, whether a partisan or not to the contest, to enter into the conflict, and exercise his full influence, whether inspired by friendship or hatred of the parties to the contest, only excluding the unseemly and improper conduct of the parties themselves, their attorneys or agents. We must therefore hold that the conduct of Hubbell was improper, to an extent that rendered him incompetent to act in the case."

The final paragraph of the *Moshier* opinion pierces to the vitals of the current case: " *It is, however, urged, that the submission was to three arbitrators named, or ·to any two of them, and the award published by the three, or any two of them, should be binding on the parties to the submission, and that it was signed and published by all three, and hence the award is made and published by two of the arbitrators, against whom there is no charge of misconduct of any kind.* This reason is more apparent than real. The misconduct of a juror has always been held ground for setting aside a verdict, notwithstanding the other eleven concurred with him in the finding; and it is because it is impossible to know the extent of his influence over the minds of the other jurors, and because that fact is incapable of proof, and can not be known, the courts, to avoid the probability that the misconduct of one has influenced the others, to keep the stream of justice certainly pure will set the verdict aside. So, here, no one

can know the extent of Hubbell's influence over the minds of the other two. For aught we can know, it may have controlled in making up the award that was published. *Plaintiff in error had the right to have all who acted, free from bias and improper influences produced after their selection. Had but the other two acted, then we can see no objection to the award. But all of the members who did act were not free from improper influences, and he was thus deprived of an essential right secured to him by the law, and for that reason the award should be set aside,* and the Circuit Court committed no error in the decree it rendered, but the Appellate Court erred in reversing it." (Italics mine.)

True, the *Moshier* precedent is an old one — 1882 — and derives from another State. But I have not perceived that time has depreciated juridical standards or that such standards are loftier in Illinois than in New York. In fact, the *Moshier* case is approvingly cited by Judge CARDOZO in *Berizzi Co., Inc.*, v. *Krausz* (239 N. Y. 315, 318).

An arresting juristic symposium on the rationale of the principle that unanimity does not save a decision where one of the deciders misbehaved or was disqualified, is found in *The Queen* v. *The Justices of Hertfordshire* (6 Q. B. [A. & E., N. S.] 753). Lord DENMAN, C. J. stated (at p. 756): " I am clearly of opinion that this order of the Quarter Sessions must be brought up to be quashed. Both these gentlemen had a disqualifying interest. * * * It is contended that, as the majority, without reckoning his vote, was in favour of the confirmation, the order is not vitiated. But, after making every possible deduction from the strength of my opinion, * * * still in my judgment *a decision is vitiated by any one interested person taking part in it.* We cannot enter into an analysis of the different motives which may have produced the decision: *It is enough to say that a single interested person has formed part of the court.* * * * It probably never occurred to him that he was interested and disqualified. Still *we must take care that interested parties do not join in deciding cases.* I think that the *prima facie* case is not answered by the fact that Mr. Fordham left the bench before the actual decision took place: for it is quite consistent with this that he may have joined in the discussion so far as to affect the result." PATTESON, J., said (at p. 757): " I suppose that, in *Regina* v. *The Cheltenham Commissioners* (1 Q. B. 467), I was not satisfied that the interference of a single interested party was sufficient to invalidate the decision: in fact the interference of the interested parties did there turn the majority; and I suppose that I was satisfied with limiting my decision to that ground. But, on consideration, I think this is unsound: I think that *it is very danger-*

*ous to allow an interested person to join, whether the majority turn on his vote or not.* The Magistrates discussed the question among themselves; and it is impossible to say what effect that discussion may have on the decision. *The real question is, has an interested person taken any part at all?"* COLERIDGE, J., said (at p. 758): " I will merely add  *  *  *  that I agree in the view now taken by my Lord and my brother PATTESON. Whether there is a properly constituted Court, is a question which must be prior to the decision. My brother PATTESON does not appear to have differed very decidedly in *Regina* v. *The Cheltenham Commissioners* (1 Q. B. 467), from our present view: he there intimates that *a magistrate who knows that he is interested, and still takes a part in the discussion, is not justified in saying that, because so many other magistrates were present, he could not have influenced the decision."* WIGHTMAN, J., said (at p. 738): " I agree: and I meant, in *Regina* v. *The Cheltenham Commissioners*, to rest upon the principle on which we are now deciding; that *we cannot enter into a discussion as to the extent of influence exercised by the interested party."* (Italics supplied.)

My conclusion is that the award should be vacated and another arbitration held in accordance with the arbitration agreement.

I am convinced that the unanimity of the three does not dissolve and clear the cloud of disqualification of the one. I confess that this determination was not easily or unhesitatingly reached, *first,* because the query is not entirely removed from the zone of debate, and, *second,* because of the general reluctance of courts — a reluctance in which I share — to sustain a challenge to an arbitration award. I am satisfied, however, that a new arbitration will better serve the cause of justice than to permit the sullied cloud to remain. This is, I am sure, a just disposition, if not technically free from doubt. To stand on just ground is, I feel, safer than to rest on the tenuous security of technicality.

I do not hold that Arnoff was corrupt or that he willfully misbehaved. Indeed, the presumption of innocence from intentional wrongdoing is accorded him. But good faith alone is of insufficient strength to repel the finding of misbehavior. (CARDOZO, J., *Berizzi Co., Inc.,* v. *Krausz, supra,* p. 318.) I am persuaded that Arnoff's participation in the arbitration, without disclosing his connection, was not in consonance with right or with the principles of fair play. It may well be that the award was a righteous one. And it is possible that Knickerbocker did not retrieve all it was entitled to. But I am quite sure that neither Granowitz's company, Knickerbocker, nor Arnoff's, Shirley, would wish a case of theirs tried by a judge who had been the recent beneficiary of an arbitration proceeding in which the opposing litigant sat as an arbitrator,

unless, of course, the judge first made known his connection, and the parties stipulated to proceed before him notwithstanding. And I am equally certain that an adverse decision of such a judge, in such a case, under such circumstances, would experience a fight for survival.

The conclusion here reached is not to be construed as an invitation to every disgruntled party to an arbitration to move for redress. We are concerned here with a particular situation and the decision is grounded on that situation. The citadel of arbitration remains inviolate.

No virtue would ensue, as I see it, from sending any of the issues to a referee, as was done in *Matter of Wersba* v. *Cobb* (254 App. Div. 481) and *Matter of Shirley Silk Co., Inc.,* v. *American Silk Mills, Inc.* (*supra*). As observed, no facts are in dispute. The question here propounded is a legal, not a factual one.

Knickerbocker's solvency not having been questioned, it shall remain in custody of the fund and hold it in escrow pending, and to abide the result of, the new arbitration. Finally, Knickerbocker should welcome the opportunity to reassert its claim in full.

The motion to vacate and set aside the award is granted to the extent herein indicated. Settle order accordingly.