Junta de Relaciones del Trabajo, etc., peticionaria, *v.* Sociedad Mario Mercado e Hijos, haciendo negocios como Central Rufina, demandada.

Número 32.

*Sometido:* 18 de diciembre de 1952. *Resuelto:* 19 de febrero de 1953.

*Hon. Procurador General Víctor Gutiérrez Franqui, Aurelio Torres Braschi, Procurador General Auxiliar,* e *Hiram Cancio Vilella* y *Ramón Acevedo Oliveras,* abogados de la peticionaria; *Pedro M. Porrata, Pedro E. Muñiz Ramos* y *Luis Torres,* abogados de la demandada.

EL JUEZ PRESIDENTE SEÑOR SNYDER emitió la opinión del tribunal.

La presente es una petición solicitando pongamos en vigor un laudo de arbitraje en una controversia obrera. La Junta de Relaciones del Trabajo de Puerto Rico radicó ante este Tribunal la solicitud a nombre de la Unión de Trabajadores de Factoría Núm. 35 de Guayanilla, Puerto Rico, contra el patrono, Sociedad Mario Mercado e Hijos, la cual opera una

central azucarera conocida como Central Rufina. El patrono radicó su contestación levantando ciertas cuestiones de hecho y de derecho, celebrándose la correspondiente vista en la cual ambas partes presentaron prueba.

El 21 de abril de 1951 la unión y el patrono celebraron un convenio colectivo, retroactivo al 1ro. de enero de 1951 y a finalizar el 31 de diciembre del mismo año. El convenio creaba un Comité de Quejas y Agravios, compuesto por dos representantes designados por la unión y dos representantes designados por el patrono, disponiéndose que si el Comité no podía ponerse de acuerdo en cuanto a resolver una controversia, las partes de mutuo acuerdo designarían un quinto miembro, que debería ser una persona de reputada solvencia moral en la comunidad.

Ángel Tirado Torres, engrasador, y Enrique Mercado Pacheco, auxiliar de electricista, trabajaban en la Central Rufina hasta que ésta los despidió en junio de 1951 debido a que un motor de la factoría se había incendiado a causa de la supuesta negligencia de ellos. Las partes sometieron el caso al Comité de Quejas y Agravios. Toda vez que los cuatro miembros del Comité no lograron ponerse de acuerdo en cuanto a los méritos de la controversia, designaron al Principal de Escuelas de Guayanilla como el quinto miembro. El 30 de junio de 1951 éste emitió su laudo, el cual fianlizaba así:

"(A) Que no habiendo la suficiente evidencia para determinar si hubo o no hubo la alegada negligencia por parte de los dos obreros, se considere el accidente como casual y se repongan los obreros en sus labores;

"(B) Que se consideren como una consecuencia del accidente todos los días que los obreros han dejado de trabajar hasta la fecha, y por lo tanto, sin opción a demandar paga por los mismos."

Alegando que el patrono se ha negado a reponer en su trabajo a Tirado y a Mercado según lo dispuesto en el laudo de arbitraje, la Junta en su petición solicita que ordenemos

(1) la reposición de estos empleados y (2) el pago a dichos señores de los salarios dejados de percibir desde el 30 de junio de 1951.

 Alega la demanda que con vista del párrafo A arriba citado, el laudo de arbitraje es nulo porque "no resuelve la cuestión en controversia sometida al quinto miembro"; v.g., si los obreros de que se trata fueron o no negligentes en el desempeño de sus labores.

La demandada tiene razón al afirmar que un laudo de arbitraje debe ser suficientemente preciso para resolver definitivamente todas las cuestiones sometidas al árbitro. . *Junta Relaciones del Trabajo* v. *New York & Porto Rico S/S. Co.*, 69 D.P.R. 782, 806–07; *Magliozzi* v. *Handschumacher & Co.*, 99 N.E.2d 856 (Mass., 1951); *Martin* v. *Winston*, 23 S.E.2d 873 (Va., 1943). *Cf. Mercury Oil Refining Co.* v. *Oil Workers International Union, CIO,* 187 F.2d 980 (C.A. 10, 1951). Pero creemos que el laudo es claro al resolver la cuestión de negligencia. En primer lugar, el párrafo A debe leerse en el contexto de toda la decisión. Inmediatamente antes del párrafo A, el quinto miembro, después de discutir la prueba en detalle, hace una manifestación categórica al efecto de que la negligencia de los obreros no se probó. En segundo lugar, aun cuando leyéramos separadamente el párrafo A del resto del laudo, dicho párrafo en sustancia significa que el patrono no cumplió con el peso de justificar el despido de los obreros estableciendo la negligencia de éstos.

Debe tenerse en cuenta que los laudos de arbitraje frecuentemente son hechos, como en este caso, por un lego. Destruiría el propósito del arbitraje si exigiéramos en los laudos sutilezas técnicas de lenguaje que ya no se requieren ni aun en las decisiones judiciales. (¹) El laudo claramente absuelve

---

(¹) En *Knickerbocker Textile Corp.* v. *Sheila-Lynn, Inc.,* 16 N.Y.S.2d 435 (N.Y., 1939) la corte dijo a la página 438: "El arbitraje es un procedimiento muy saludable. De ahí el motivo por qué se ha ido tornando cada día más en un método valioso y popular. Economiza tiempo y dinero. Descongestiona a los tribunales. Es sencillo, rápido y libre de los innumerables tecnicismos que dificultan y atrasan los pleitos. Sus

a los obreros de negligencia alguna que justifique su despido y ordena su reposición. Por consiguiente, se ajusta al requisito de que un laudo de arbitraje debe ser suficientemente preciso para resolver definitivamente todas las cuestiones sometídales al árbitro.

■■ Al discutir este punto, la demandada también descansa en el hecho de que en el párrafo B el quinto miembro rehusó conceder a los obreros paga atrasada por el período entre la fecha de su despido y la fecha del laudo. Sostiene la demandada que esto es una conclusión implícita al efecto de que hubo negligencia de parte de los obreros en contradicción a la conclusión anterior del párrafo A al efecto de que no había habido evidencia sobre la cual determinar la cuestión de negligencia. No estamos conformes con esta contención. En ausencia de una disposición expresa en contrario en el convenio colectivo, el quinto miembro tenía facultad (1) para resolver que aun considerando ciertos los hechos en los cuales el patrono basaba el despido, ésta era una pena demasiado drástica, y (2) para modificar dicha pena. *Junta Relaciones del Trabajo* v. *New York & Porto Rico S/S. Co.*, supra, pág. 803. En igual forma, el quinto miembro tenía autoridad para resolver que, a pesar de que los empleados no fueron negligentes, éstos no tenían derecho a recibir paga por el tiempo en que el motor averiado era objeto de reparaciones. Nada encontramos en el párrafo B que destruya la conclusión del párrafo A al efecto de que Mercado y Tirado no fueron negligentes.

■ Seguidamente arguye la demandada que las conclusiones de hecho del quinto miembro son inconsistentes con el laudo. Aquí discute ella la prueba y el análisis de la misma que hizo el quinto miembro en su decisión. Es innecesario

decisiones gozan de una finalidad que no es inherente en los pleitos. Es un método eficiente de resolver diferencias. Por consiguiente, debemos estimular el arbitraje. ..." Creemos que lo arriba dicho es particularmente apropiado para las disputas obreras. Véase *Junta Relaciones del Trabajo* v. *New York & Porto Rico S/S. Co.*, 69 D.P.R. 782.

detenernos a examinar esta contención, toda vez que un laudo de arbitraje, en ausencia de alguna limitación en el acuerdo de arbitrar, no puede dejarse sin efecto debido a errores de criterio bien sean éstos de hecho o de derecho. *Junta Relaciones del Trabajo* v. *New York & Porto Rico S/S. Co.*, supra, pág. 800.

La próxima contención de la demandada es al efecto de que ella ha cumplido con el laudo. Esto nos exige referirnos a la prueba aducida anté nos. La prueba de ambas partes fué al efecto de que la demandada nada hizo para poner en vigor el laudo entre el 30 de junio y el 17 de octubre de 1951; que en la segunda fecha Carlos Quirós Trujillo, Jefe Examinador de la Junta de Relaciones del Trabajo, visitó la oficina de la demandada para investigar una querella de la Unión en cuanto a que el laudo no había sido cumplido; que el mismo día un oficial de la demandada entregó a Quirós dos cheques a favor de Mercado y de Tirado por $28.32 cada uno, que representaban la paga a que ellos tenían derecho desde el 30 de junio al 5 de julio de 1951, fecha en que había terminado la zafra; y que Tirado más tarde hizo efectivo su cheque pero que la Unión había devuelto el cheque de Mercado a la Junta, la cual todavía lo tenía en su poder.

Sin embargo, la prueba es contradictoria en cuanto al propósito de estos pagos. El auditor de la demandada declaró que Quirós convino en que el caso sería considerado como terminado y transigido por los referidos pagos, en el entendido de que Mercado y Tirado serían repuestos en sus empleos al comenzar la zafra de 1952. El Ingeniero Jefe de la demandada declaró al mismo efecto, manifestando que "habíamos quedado en que los obreros había que reponerlos durante la zafra porque en tiempo muerto no hay garantía de trabajo para ninguno; se terminaba la zafra y nosotros estamos libres para usarlos si creemos si podemos a discreción nuestra. Habíamos quedado que en la próxima zafra era que nosotros teníamos que volver a darles trabajo." El Ingeniero Jefe declaró también que Tirado había fallecido antes de comen-

zar la zafra de 1952 el 20 de enero de 1952, (²) y que Mercado no estaba trabajando en la factoría de la demandada porque había encontrado trabajo posteriormente en la Central Cortada.

El último testigo de la demandada fué su Jefe Electricista, quien declaró que durante el tiempo muerto de 1951 no se emplearon nuevos obreros para sustituir a Tirado y a Mercado, porque era fácil dividir el trabajo de éstos entre los otros obreros durante el tiempo muerto. Sin embargo, declaró asimismo que "en el tiempo muerto yo usaba el personal de acuerdo al trabajo, si tenía mucho trabajo lo cogía todo, *si tenía poco dividía el tiempo entre ellos*". (Bastardillas nuestras.) Manifestó que Mercado, que trabajaba con él era incluído en esta división de trabajo durante los tiempos muertos antes del 1951. También declaró que en la zafra de 1952 había sustituído a Mercado con un nuevo obrero.

Quirós fué el primer testigo de la peticionaria. Declaró que en la entrevista con los oficiales de la demandada el 17 de octubre de 1951 les pidió que repusieran a Tirado y a Mercado. Uno de los funcionarios contestó que esto no se podía hacer, ya que todo el trabajo en la factoría había cesado el 5 de julio y que aun si Tirado y Mercado hubieran sido repuestos el 30 de junio, su empleo habría terminado el 5 de julio. Quirós insistió en que de todos modos la demandada le adeudaba a estos dos obreros la paga por seis días, desde el 30 de junio al 5 de julio. El oficial de la demandada preguntó si la demandada venía obligada a reponerlos al comienzo de la zafra de 1952. Quirós replicó que esta cuestión sería resuelta más tarde, pero que lo que estaba pendiente en aquel momento era la paga por los seis días.

Quirós declaró además que se le entregaron los dos cheques, pero que él se negó a permitirle al abogado de la demandada que escribiera al dorso de los mismos un endoso al efecto

---

(²) Las partes más tarde estipularon que Tirado había fallecido el 22 de febrero de 1952.

de que eran como pago total de los salarios adeudados a Tirado y Mercado y como transacción definitiva del caso. El testigo expresamente hizo constar que dichos cheques constituían solamente la paga por seis días, y nada más. Ni él ni nadie más en ese momento, hicieron compromiso alguno en cuanto a la reposición de estos dos empleados al comienzo de la zafra de 1952.

Quirós declaró que él esperó para levantar la cuestión de nuevo hasta que Tirado escribió a la Junta un mes más tarde al efecto de que él no aceptaría el cheque por que éste no reflejaba la cantidad a que él tenía derecho ya que su departamento continuaba trabajando durante el tiempo muerto. Quirós concluyó que Tirado y Mercado tenían derecho a ser repuestos durante el tiempo muerto porque la investigación que él hizo de las nóminas de la demandada demostraba que ellos trabajaban durante el tiempo muerto en años anteriores. Declaró Quirós que "unos trabajaban 40 horas semanales, otras 20, 10, 15, pero hay períodos de trabajo durante años anteriores en que trabajaba el personal total del departamento."

Ferdinand Quintana, un empleado de la central, como testigo de la peticionaria, declaró que Mercado trabajó con él hasta que Mercado fué substituído por Celestino González, quien hacía reparaciones de motores y trabajos de electricidad durante el tiempo muerto de 1951, trabajo que en años anteriores había sido hecho por otros obreros incluyendo a Mercado. También declaró Quintana que Tirado había trabajado durante el tiempo muerto de otros años con anterioridad al 1951 "de acuerdo con el trabajo que tenían."

Suponemos sin decidirlo que Quirós tenía autoridad para transigir el caso a nombre de Tirado y de Mercado. Pero rechazamos el testimonio de la demandada de que en efecto tal transacción ocurrió. Por el contrario, damos crédito a la declaración de Quirós al efecto de que bajo las circunstancias él meramente procedió a aceptar los cheques que comprendían

los seis días de trabajo por el cual la demandada admitía responsabilidad, dejando pendiente provisionalmente la cuestión de la reposición.

■ En vista de nuestra determinación de que en este caso no hubo transacción alguna, pasamos ahora a la cuestión de si la demandada ha dado cumplimiento al laudo propiamente dicho. Sobre la cuestión de la reposición, la prueba ante nos es clara (1) de que antes del 1951 tanto Tirado como Mercado trabajaban durante el tiempo muerto hasta donde hubiera trabajo para ellos, y (2) de que tal trabajo se continuó haciendo por otros obreros durante el tiempo muerto de 1951. En consecuencia, la demandada venía obligada bajo el laudo a reponer a Tirado y a Mercado el 30 de junio de 1951 y a darles después del 5 de julio de 1951 la parte proporcional del trabajo que hubiera disponible que de ordinario ellos realizaban en los tiempos muertos anteriores. Por consiguiente no podemos convenir con la demandada en que ella ha dado cumplimiento al laudo de arbitraje.([3])

■ La demandada también arguye que la Junta está impedida por sus actos voluntarios de solicitar se ponga en vigor el laudo. Es dudoso si la doctrina de impedimento en equidad en que descansa la demandada es aplicable a este caso, aun cuando hubiéramos dado crédito al testimonio de los testigos de la demandada. Véase *Hopgood* v. *Porto Rican and American Ins. Co.*, 60 D.P.R. 329, 335; casos citados en 19 Am. Jur., págs. 634–5. Pero nunca llegamos a esta cuestión ya que hemos rechazado el testimonio en que la demandada la predica.

■ Finalmente, la demandada sostiene que de cualquier modo el laudo no la obliga después del 31 de diciembre de 1951, fecha en que el convenio colectivo expiró. Pero como

---

([3]) Este resultado es a tenor tanto con la práctica de la demandada como con una cláusula del convenio colectivo que requiere del patrono que distribuya el trabajo durante el tiempo muerto en la forma más equitativa posible con el fin de beneficiar el mayor número posible de obreros, tomando en consideración sus empleos anteriores con el patrono.

.dijimos en *Junta Relaciones del Trabajo* v. *New York & Porto Rico S/S. Co.*, supra, pág. 800, "Un laudo de arbitraje no es ni un contrato ni una sentencia, pero disfruta de la naturaleza de ambos." Si la cuestión que se arbitró surgió bajo y durante la vida del convenio colectivo, un laudo a favor de un empleado no puede ser frustrado por el patrono por demora en su cumplimiento hasta la expiración del convenio.

Aquí si la demandada hubiera dado cumplimiento al laudo el 30 de junio de 1951, no hubiera surgido cuestión alguna en cuanto al derecho de Mercado y de Tirado a ser empleados durante el 1952 y 1953. No podemos permitirle a la demandada que se refugie en la infracción de su convenio, particularmente en ausencia de prueba que demuestre que en virtud de un nuevo convenio colectivo o por algún otro motivo Mercado y Tirado no eran elegibles a ser empleados por ella después del 1ro. de enero de 1952. Un argumento un tanto similar no nos persuadió tampoco cuando rechazamos la contención de un patrono en un caso de práctica ilícita del trabajo al efecto de que la Junta podía ordenarle negociar colectivamente sólo por la zafra del año en que cometió la práctica ilícita de trabajo de negarse a negociar. *Rivera* v. *Junta Relaciones del Trabajo*, 70 D.P.R. 5, 15. Y véanse *Lane* v. *Endicott Johnson Corporation*, 75 N.Y.S.2d 171 (N.Y., 1947); *Motor Haulage Co.* v. *International Brotherhood, etc.*, 69 N.Y.S.2d 656 (N.Y., 1947).

La petición para que pongamos en vigor el laudo solicita tanto reposición como paga atrasada. Ordenaremos la reposición solamente en cuanto a Mercado ya que de los autos aparece que Tirado falleció el 22 de febrero de 1952. En cuanto a la paga atrasada, la demandada será ordenada a pagarle a Mercado y a Tirado las cantidades que ellos hubieran recibido, menos su ingreso neto, de haber alguno, devengado en otro sitio durante el período envuelto o menos las cantidades, de haber algunas, que ellos no ganaron sin excusa alguna, en

cualquier otro empleo disponible. Las cantidades exactas adeudadas serán dejadas como en el pasado a la maquinaria administrativa de la Junta, con la cooperación del patrono, cuyas nóminas servirán de base para el cómputo final. *Junta de Relaciones del Trabajo* v. *New York & Porto Rico S/S. Co.,* supra, pág. 817; *Rivera* v. *Junta Relaciones del Trabajo,* supra, págs. 13–14. (⁴)

Los Jueces Asociados Señores Negrón Fernández y Ortiz no intervinieron.

---

(⁴) Creemos innecesario añadir que cualquier reclamación de los herederos de Tirado, de haber alguno, por la paga atrasada es válida solamente por el período entre el 30 de junio, 1951 y el 22 de febrero, 1952. También, en ambos casos la compensación por los períodos muertos necesariamente comprenderá un estimado de la proporción del trabajo disponible que se hubiera asignado a Mercado y a Tirado durante tales períodos muertos.