Opinión disidente emitida por
la Jueza Asociada Señora Fiol Matta.
La Opinión del Tribunal limita las facultades que tienen los árbitros para conceder remedios en casos de despidos injustificados cuando está vigente un convenio colectivo y extiende el alcance de la Ley Núm. 80 más allá de sus cauces legislativos para cubrir situaciones que la Asamblea Legislativa no contempló. Por entender que ello es contra-rio a la política pública y la legislación sobre relaciones obrero patronales, disiento.
I
A. Los dos ámbitos en las relaciones laborales en el sector privado(1)
En nuestro sistema comprensivo de relaciones labora-les, las relaciones contractuales entre los patronos y sus *352 trabajadores tienen lugar en dos ámbitos, el individual y el colectivo. En el primero, se conforma un contrato individual de trabajo entre el patrono y el empleado, en el cual, por lo general, es el patrono quien establece los términos y las condiciones en los cuales el empleado debe realizar su trabajo.(2) Mientras, en el segundo, el contrato laboral es colectivo porque los trabajadores optaron por organizarse sindicalmente para lograr mejores condiciones de trabajo y salario a través de la negociación colectiva.(3)
Como parte del contrato de trabajo individual, el em-pleado adquiere una serie de derechos producto de la legis-lación social que se aprobó para hacer viables las disposi-ciones constitucionales que conforman el aspecto sustan-tivo del derecho laboral.(4) El conjunto de estos estatutos componen la Legislación Protectora del Trabajo, que define las condiciones mínimas de trabajo de los empleados, tales como el máximo de horas de la jornada laboral, el pago de *353 horas extras y el salario mínimo, entre otras.(5) Como regla general, estos derechos tienen vigencia automática, por lo cual existen aunque el trabajador no los reclame.(6)
Cuando el empleado toma la decisión de suscribir un contrato de trabajo colectivo, mantiene los derechos míni-mos que adquirió a través de la legislación protectora del trabajo. Sin embargo, la nueva relación contractual colec-tiva puede ampliar estas protecciones limitadas, al estar cobijada por la legislación sobre relaciones obrero-patrona-les, cuya aplicación se extiende exclusivamente a los em-pleados sindicados. Concretamente, esta normativa brinda a los unionados diversos mecanismos para obtener, mejo-rar y preservar sus condiciones de empleo y salario. Algu-nos de estos son las huelgas, los piquetes y la opción de organizarse sindicalmente y negociar colectivamente a tra-vés de un representante exclusivo.(7) Además, esta norma-tiva es la que establece las reglas que regirán las relacio-nes laborales entre patronos y obreros cuando se utilice cualquiera de estos mecanismos.
Como se puede observar, los empleados hacen uso de los mecanismos que provee la legislación sobre relaciones obrero-patronales para lograr mejores beneficios económi-cos y sociales, o lo que es lo mismo, expandir las proteccio-nes mínimas que impone la legislación protectora del trabajo. Esto implica que los derechos que se adquieren de acuerdo con el contrato de trabajo colectivo no se obtienen automáticamente, como los que surgen cuando se establece un contrato individual(8) Más bien, son producto de un proceso de negociación, en el contexto de una normativa *354 especial, que convierte la relación originalmente desigual, entre el empleado y el patrono, en una más balanceada.
De acuerdo con el Ledo. Ruy Delgado Zayas, la legisla-ción protectora del trabajo incluye tres componentes prin-cipales: (1) la legislación que protege al empleo; (2) la le-gislación sobre el contrato de trabajo, y (3) la legislación sobre seguridad social, que abarca los seguros laborales así como la protección de la seguridad y salud en el trabajo.(9) Por ser lo pertinente a esta controversia, nos centraremos en la legislación que protege el empleo.
Como regla general, la Ley Núm. 80 de 30 de mayo de 1976 (Ley Núm. 80), conocida como Ley de Despido Injus-tificado,(10) es la que se encarga, en el ámbito individual, de proteger el empleo de los que trabajan en el sector privado.(11) Esta intención se devela claramente en la expo-sición de motivos de la ley al proclamar que “[y]a es tiempo que se proteja de una forma más efectiva el derecho del obrero puertorriqueño a la tenencia de su empleo .. .”.(12)
Sin embargo, la Ley Núm. 80 no prohíbe el despido in-justificado; más bien lo reglamenta, al concederle al em-pleado una indemnización económica como su único *355 remedio. Esto implica que el propósito o la esencia de esta normativa no es prohibir el despido sin causa, sino disua-dir al patrono de tomar la decisión de despedir a un em-pleado injustificadamente.(13) En otras palabras, la protec-ción concreta del trabajo existente bajo esta ley es más bien laxa. Las discusiones de los legisladores al momento de evaluar esta medida evidencian que se trataba, como expresó el senador Hernández González, de “un proyecto puro y simplemente de compensación” que no imponía la obligación de reemplear.(14) Con el proyecto, como expuso claramente el senador Nogueras, se le dijo “al patrono que ahora le va a costar un poquito más el salir arbitraria y caprichosamente de un empleado. Y a veces los patronos prefieren pagar un poquito para salir de un empleado por capricho y ese sería aumentar un poquito el costo del capricho”.(15)
Esta particularidad no cambió con la enmienda que la Asamblea Legislativa realizó durante el 2005 a la Ley Núm. 80. Dicha enmienda no incluyó la restitución del em-pleado al trabajo como remedio al despido injustificado, ni mucho menos la paga del salario atrasado. Sólo se amplió la “mesada” que el obrero recibiría si fuese despedido sin justa causa, de manera que al patrono se le hiciera más difícil tomar esa decisión. Resultan ilustrativas las expre-siones que hizo el representante Reyes Oppenheimer sobre la enmienda:
... La protección de la Ley Núm. 80 se ha probado que es un remedio poco efectivo para el empleado despedido sin justa causa, en comparación con los beneficios que recibe la empresa
*356 al despedir al obrero. ... El objetivo de desalentar el despido por razones injustificadas de la Ley Núm. 80 parece no haber tenido éxito. ... En muchas ocasiones se ha convertido la in-demnización como vía de escape para despedir a los trabaja-dores en forma injusta y caprichosa. Las enmiendas sugeridas mediante este Proyecto, pretenden corregir las injusticias que se cometen por ser el remedio de la indemnización uno exiguo.
... La aprobación de esta medida desalentaría lo[s] despidos que se hacen de forma caprichosa y arbitraria. En menospre-cio de lo mejor que tiene nuestra economía su mano de obra.
La compensación por despido injustificado hará un balance entre el desarrollo económico y los derechos de los trabajado-res desalentando y penalizando la práctica de despidos arbi-trarios que no tienen relación con el desempeño y las opera-ciones del patrono. Debemos entender que la política pública detrás de la mesada, es ... disuadir el despido injustificado y no como un precio que el patrono está dispuesto a pagar por [despedir a] un obrero sin justificación alguna.(16)
Es evidente que la Legislatura aprobó la Ley Núm. 80 para regir el ámbito laboral individual, es decir, para pro-teger al trabajador individual que está en desventaja ante su patrono porque tiene que aceptar las condiciones que este le imponga. Concretamente, el estatuto se refiere en todo momento a ese empleado individual y es a este al que otorga el remedio de la llamada “mesada” cuando lo despi-den de su cargo sin justa causa. Claramente, el propio texto de la Ley Núm. 80 revela que esta no se concibió para tratar los problemas que se manifiestan en el ámbito colectivo de trabajo, pues estos no se dan entre el patrono y el empleado como individuo, sino entre el patrono y los empleados orga-nizados en una organización obrera.(17)
A pesar de que las leyes propias de ambos ámbitos, el- *357 individual y el colectivo, tienen como norte la protección del trabajo existente, los remedios que cada uno provee son totalmente diferentes. La Ley Núm. 80 posibilita legal-mente los despidos injustificados si el patrono paga cierta cantidad de dinero, conocida como la “mesada”.(18) Por el contrario, en el ámbito colectivo solo se tolera el despido si el patrono lo realiza por justa causa.
La negociación colectiva, concretada en el convenio co-lectivo y aplicada efectivamente y de forma continuada a través del arbitraje obrero-patronal, tiene como esencia y objetivo, no la reglamentación del despido, sino la protec-ción efectiva de la tenencia del empleo existente. De lo con-trario, no tendría sentido alguno ampliar y mejorar los be-neficios laborales de los obreros. Por eso, los trabajadores que decidan organizarse y negociar colectivamente pueden ampliar el derecho mínimo de la indemnización económica que la Ley Núm. 80 concede en el ámbito de la relación contractual individual. La razón de ser de la negociación colectiva le obliga a no tolerar el despido injustificado y a reparar efectivamente su ocurrencia, permitiendo que el trabajador sea reinstalado en su puesto y que, en muchos casos, reciba la paga atrasada.
La política pública que promueve las relaciones obrero-patronales y la negociación colectiva para el sector corpo-rativo de las agencias gubernamentales y el sector privado no cubierto por la normativa federal, se encuentra en la *358 Ley Núm. 130 de 8 de mayo de 1945, conocida como la Ley de Relaciones del Trabajo de Puerto Rico.(19) Este estatuto se basa, principalmente, en la Ley Nacional de Relaciones Laborales de 5 de julio de 1935, mejor conocida como Ley Wagner.(20)
El mecanismo de la negociación colectiva se conceptuó tan positivamente que los convenios colectivos se declara-ron “instrumentos para [promover] la política pública del Gobierno” y, como tales, fueron revestidos de interés público.(21) Se visualizaba al convenio colectivo como el mecanismo más importante de la negociación colectiva, que “representa el triunfo ... de la negociación sobre la fuerza [y el de] la razón sobre la intransigencia”.(22) Además, el convenio es un contrato que tiene fuerza de ley entre quie-nes lo acuerdan, siempre que no sea contrario a la ley, la moral o el orden público, y sus normas obligan tanto al patrono como a la unión y a sus miembros.(23) De esta forma, se incorporan a los contratos individuales las condi-ciones de trabajo convenidas, “como expresión del efecto regulador del convenio al que ha conducido la negociación”.(24) Por esto, este Tribunal ha manifestado que la validez y eficacia de estos contratos “debe ser siempre objeto del más entusiasta endoso por parte de los tribunales”.(25)
*359 La negociación colectiva también se adoptó por su po-tencial de convertirse en un mecanismo capaz de balancear los intereses de todas las partes y de redistribuir el poder y la riqueza entre todos los sectores. Por eso, los empleados obtuvieron el derecho de asociarse en organizaciones obre-ras de su preferencia para que estas los representaran ante sus respectivos patronos.(26) Estas organizaciones obreras, que usualmente se conocen como “uniones” o “sin-dicatos”, las constituyen los mismos trabajadores “para su protección y con el. objeto de negociar colectivamente con los patronos sobre salarios, condiciones de trabajo y demás beneficios y reinvindicaciones”, además de todo lo refe-rente a disputas y a quejas y agravios.(27) Esta posibilidad de lograr términos y condiciones de empleo que resulten más justos para los empleados es la esencia de la negocia-ción colectiva.(28)
La política pública laboral dispuesta en la Ley de Rela-ciones del Trabajo de Puerto Rico se incorporó y expandió en la Carta de Derechos de la Constitución del Estado Li-bre Asociado aprobada en 1952, específicamente, en las si-guientes disposiciones:
[Sección 17:] Los trabajadores de empresas, negocios y pa-tronos privados y de agencias o instrumentalidades del go-bierno que funcionen como empresas o negocios privados ten-drán el derecho a organizarse y a negociar colectivamente con sus patronos por mediación de representantes de su propia y libre selección para promover su bienestar.(29)
[Sección 18:] A fin de asegurar el derecho a organizarse y a negociar colectivamente, los trabajadores de empresas, nego-cios y patronos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados *360 tendrán, en sus relaciones directas con sus propios patronos, el derecho a la huelga, a establecer piquetes y a llevar a cabo otras actividades concertadas legales.(30)
Las expresiones de los delegados a la Convención Cons-tituyente mientras consideraban estas medidas constitu-cionales confirman la importancia que otorgaban a la ne-gociación colectiva y su intención de que esta sirviera para que los trabajadores obtuvieran beneficios laborales mejo-res y mayores que los mínimos dispuestos por ley. Así lo expresó el delegado Paz Gránela, al reconocer que “el con-venio colectivo puede mejorar, por convenio de las partes [,] las mismas condiciones que dispone la ley”.(31) La intención de los constituyentes de facultar a los trabajadores para que se organizaran y pudieran negociar colectivamente mejores condiciones de empleo y salario ante sus patronos, se percibe también en el Informe de la Carta de Derechos, que hace énfasis en que: “El conjunto de derechos que aquí se consigna tiene como eje central el propósito de proveer al trabajador una manera eficaz y práctica para contratar con su patrono.”(32)
Ante este marco conceptual, ha sido obligatorio concluir que los convenios colectivos son un mecanismo efectivo para conceder a los trabajadores unionados mayores bene-ficios que los que provee la legislación laboral del ámbito individual aprobada por la Asamblea Legislativa.(33) En el contexto específico de los despidos injustificados, varios es-tudiosos del derecho laboral coinciden en que los emplea-dos con derecho a negociar colectivamente tienen una pro-tección más real y concreta que la que disfrutan los trabajadores que sólo tienen derecho a la “mesada”. Esta es la indemnización máxima que se puede obtener en el *361 ámbito laboral individual. Sobre este particular, el profesor Acevedo Colom ha expresado:
[E]l remedio de reposición en casos de despido injustificado es objeto de negociación colectiva diariamente en nuestr[o] país, y en los casos en que media un convenio colectivo a esos efec-tos, este remedio resulta más abarcador que según lo dispone la legislación vigente. En el campo del arbitraje obrero-patronal la restitución o reposición en el empleo es una de las reclamaciones y controversias más comunes.(34)
Precisamente, la posibilidad de convenir colectivamente conlleva la extensión y ampliación de los derechos concedi-dos por ley. En efecto, "[u]no de los incentivos de la organi-zación sindical y la negociación colectiva es ofrecerle a las partes un marco de referencia que trascienda lo legislado. No se negocia un convenio colectivo meramente para volcar verbatim la legislación laboral aplicable”. (Énfasis suprimido.(35)
Indiscutiblemente, en términos de los remedios disponi-bles para el trabajador, existe una brecha gigantesca entre el ámbito individual y el colectivo de las relaciones labora-les del sector privado. Hay una clara diferencia entre un trabajador individual y un trabajador organizado sindicalmente. El primero puede ser despedido injustifica-damente si el patrono está en disposición de pagar el monto de su mesada. Mientras que el segundo está ampa-rado por el espíritu de la negociación colectiva, orientado a conceder mayores y mejores condiciones de empleo y sala-rio, lo que incluye la protección efectiva del empleo exis-tente mediante su reposición en el empleo. La fragilidad del trabajador individual es obvia y es precisamente por eso que la Ley Núm. 80 se creó para protegerlo.
*362 La seguridad de empleo que ofrece la negociación colec-tiva, a través de un convenio colectivo, es incompatible con la alternativa que la Ley Núm. 80 provee a los patronos de comprar con una mesada el derecho a la tenencia de un empleo que disfruta un trabajador. El trabajador organi-zado sindicalmente no necesita de la Ley Núm. 80 de 1976. De hecho, la aplicación de esta en su ámbito representaría una pérdida significativa de los derechos que le provee el convenio colectivo.
Nuestra jurisprudencia ha reconocido esta realidad. He-mos resuelto que la Ley Núm. 80 “no aplica cuando están involucrados los convenios colectivos”.(36) Al así expresar-nos, evidentemente no hemos pretendido aseverar que el mínimo que protege esta ley no aplica a casos que involu-cran convenios colectivos. Todo lo contrario, ha sido un re-conocimiento de que la Ley Núm. 80 no limita ni establece el tope obligatorio cuando se trata de un remedio al am-paro de un convenio colectivo. En otras palabras, no es comparable el esquema de remedios que provee la Ley Núm. 80 con las facultades considerablemente más am-plias que tienen los árbitros en el contexto colectivo. Así resolvimos enJ.R.T. v. Securitas, Inc., 111 D.P.R. 580, 583 (1981),(37) al afirmar que “[e]n Puerto Rico hemos distin-guido tajantemente entre los derechos bajo un convenio co-lectivo y los derechos de mesada”. (Enfasis suplido.)
B. El arbitraje obrero-patronal: una herramienta indispensable en la negociación colectiva
El arbitraje es uno de los métodos alternos a la inter-vención judicial para la solución de conflictos. Existen diversas modalidades de arbitraje, entre las cuales se en-cuentra la que se encarga de resolver disputas obrero- *363 patronales. En Estados Unidos esta institución se desarro-lló grandemente después de la Segunda Guerra Mundial, con la aprobación de Ley Federal de Relaciones del Trabajo de 23 de junio de 1947, conocida como la Ley Taft-Harley.(38) Mientras, en Puerto Rico, el arbitraje laboral se estableció dos años antes, en la Ley Núm. 130 de 1945.
El arbitraje laboral puede ser compulsorio o voluntario. La primera modalidad, conocida también como “arbitraje compulsorio legislativo”, se activa cuando surge un tran-que en el proceso de negociación del convenio colectivo. Su carácter imperativo surge como resultado de una ley especial. (39) Aquí las partes no pueden acudir al recurso de la huelga o cierre patronal y tienen que esperar la deter-minación del árbitro con relación al tranque en la negociación.
El arbitraje obrero-patronal voluntario se caracteriza por ser un procedimiento de naturaleza contractual, a tra-vés del cual el patrono y el representante exclusivo de los trabajadores se obligan a someter ante un tercero neutral la controversia que tienen entre sí, de manera que este proceda a resolverla. Ambas partes se encargarán de defi-nir no tan solo el pleito que someterán al árbitro, sino tam-bién sus facultades. Una vez las partes se someten a este procedimiento deberán respetar el laudo del árbitro.(40)
En Puerto Rico existe una vigorosa política pública a favor del arbitraje obrero-patronal como mecanismo para resolver los conflictos que se originan entre patronos y *364 empleados. (41) Tal deferencia se debe, primero, a que es un mecanismo adjudicativo menos técnico, más flexible y más costo efectivo que el proceso judicial; segundo, porque es el mecanismo que se encarga de mantener la estabilidad la-boral y, tercero, porque es parte importante de nuestro sis-tema de relaciones laborales, ya que es un aspecto integral de la negociación colectiva.(42)
Según explica el Prof. Hiram R. Cancio, el arbitraje obrero-patronal, más que un sustituto de los tribunales, es un sustituto de la huelga y “un complemento o parte inte-grante de la negociación colectiva, procedimiento éste que, de acuerdo con la política pública del Gobierno de Puerto Rico y de los Estados Unidos, es el mejor medio para lograr la paz industrial”.(43) En definitiva, el arbitraje obrero-patronal, al ser producto de la negociación colectiva, tam-bién está revestido de un alto interés público.
C. El árbitro y su facultad para conceder remedios adecua-dos
El árbitro es la figura clave para resolver las disputas que se suscitan en el contexto obrero-patronal. En cierto sentido, el árbitro es el sustituto del juez.(44) Desde un punto de vista técnico-jurídico se ha dicho que el árbitro es un “lj]uez imparcial que las partes en controversia selec-cionan o aceptan para someterl[e] y para que resuelva las *365 cuestiones en litigio que no hayan podido ser resueltas a través de la negociación [colectiva] directa ...”.(45) Se en-tiende que las personas escogidas como árbitros tienen la experiencia y el conocimiento especializado sobre el ámbito laboral colectivo, lo cual incluye las organizaciones obreras y todos los mecanismos que conforman las relaciones obrero-patronales. (46) Comparten, también, la preocupa-ción de que la relación laboral entre las partes perdure, una vez emitido el laudo.
La facultad del árbitro para adjudicar controversias obrero-patronales se la otorga el convenio colectivo y el pacto de sumisión.(47) Por lo tanto, son las partes quienes determinan las reglas procesales y el marco normativo en el cual debe actuar el árbitro. El tratadista Frank Elkouri lo explica como sigue:
Arbitration exists as a private alternative to the courts. As such, the rules are those drafted ... by the parties themselves. They are private rules, and the party chosen to interpret and apply them —the arbitror— is an individual who draws his or her authority from the collective bargaining agreement, or the agreement, to submit the matter to arbitration. As such, private-sector parties are free to control the degree to which the arbitror is to consider external law, including statutes and regulations, in deciding the case.(48)
En el caso ante nosotros, el convenio colectivo entre la SPU y la COPR claramente dispone que si la disputa entre el empleado y el patrono no se puede solucionar mediante *366 el procedimiento interno de quejas y agravios, el asunto se someterá al Negociado de Conciliación y Arbitraje del De-partamento del Trabajo y Recursos Humanos.(49) De acuerdo con la reglamentación que rige los trabajos de esta unidad administrativa, el árbitro tendrá la responsabili-dad de modificar, revocar o confirmar la medida disciplina-ria que imponga el patrono, de forma final y obligatoria.(50)
De ordinario, las partes someten en conjunto el pacto o acuerdo de sumisión que define el asunto específico que el árbitro debe resolver.(51) Si esto no ocurre, el árbitro tiene la potestad de elaborar la controversia, considerando “el convenio colectivo, las contenciones de las partes y la evi-dencia admitida”.(52) En este caso, como la SPU y la COPR no pudieron acordar un pacto de sumisión conjunto, la ár-bitra Guzmán Rodríguez determinó que el asunto a resolver era “[d]eterminar si el despido del señor Lugo Reyes, estuvo o no justificado [y d]e no estarlo, que la árbitro aplifcara] el remedio adecuado”.(53)
Para resolver la disputa y conceder un remedio, el árbi-tro tiene la obligación de interpretar el convenio colectivo. Esta es su función principal y al realizarla debe tener “el debido cuidado que exige su investidura”.(54) La idea es que el árbitro logre conferirles significado y sentido a las dis-posiciones del convenio, de forma cónsona con las preferen- *367 cias que negociaron las partes contratantes.(55) En pala-bras sencillas, el árbitro tiene la responsabilidad de concretar el convenio, develando la intención de las partes.
En este proceso interpretativo, el árbitro debe conside-rar ciertas reglas derivadas de la interpretación de los con-tratos: (1) adscribirle al lenguaje su significado común, salvo que el convenio provea expresamente una definición especial; (2) otorgarle su significado usual a los términos técnicos; (3) leer el convenio como un todo e interpretar cada parte con referencia a las demás cláusulas; (4) no des-cartar los usos y las prácticas pasadas, porque estos pue-den ofrecerle unas guías significativas para interpretar las cláusulas del convenio; (5) asegurarse que su interpreta-ción del convenio sea razonable y efectiva, y (6) interpretar el sentido literal de aquellas cláusulas que reflejen clara-mente la intención de las partes.(56) Al interpretar el con-venio colectivo, el árbitro no está limitado exclusivamente a su contenido, sino que puede hacer uso de otras fuentes, siempre que se respete la esencia del contrato.(57)
La opinión mayoritaria afirma que es deber del árbitro interpretar las cláusulas del convenio colectivo.(58) Sin embargo, hace caso omiso a esa interpretación integral del convenio que le corresponde hacer, en primera instancia, al árbitro, y que según los tratadistas y nuestra jurispruden-cia merece una gran deferencia por parte de este Tribunal. La opinión mayoritaria otorga deferencia a algunas deter-minaciones de la árbitra y a otras no. Así, reconoce que existe una “deferencia que le otorgamos a la árbitra en su *368 interpretación del término justa causa” según la Ley 80, pero no le concede deferencia a la interpretación que da la árbitra al silencio del convenio sobre la facultad de conce-der remedios. La árbitra, como intérprete primaria del con-venio, concluyó que el silencio del convenio en cuanto al remedio ampliaba sus facultades. Por el contrario, la ma-yoría interpreta que el silencio las limita y convierte el remedio mínimo posible, establecido por ley para el con-trato de trabajo individual, en el máximo otorgable bajo un convenio colectivo. Ello contradice la flexibilidad para es-tablecer los remedios que la propia opinión mayoritaria le reconoce a los árbitros para responder “a una variedad de situaciones que las partes no atendieron expresamente en el convenio laboral”. So color de asegurar que esa flexibili-dad no sea “irrestricta”,(59) la opinión mayoritaria elimina toda flexibilidad y restringe al máximo esa capacidad del árbitro de crear remedios.
Este comportamiento choca directamente con nuestras reiteradas determinaciones de que nuestra interpretación en estos casos debe ser a favor del obrero, política que la mayoría menciona pero no pone en vigor. (60) En vez de la interpretación liberal reiterada como correcta a través de los años, la opinión mayoritaria adopta la interpretación más restrictiva posible.
D. El laudo arbitral
La determinación que toma el árbitro respecto a la con-troversia laboral se conoce como “laudo de arbitraje”. Este “no es ni un contrato ni una sentencia, pero disfruta de la naturaleza de ambos”.(61) A través de esta decisión es que el árbitro resuelve el litigio de forma final e inapelable.(62) Su *369 estructura está definida por dos elementos principales: la parte sustantiva de derecho, es decir, la razón de la deci-sión, y la parte dispositiva, que es donde se establece el remedio a la disputa. Una vez se emite el laudo, termina la fimción adjudicativa del árbitro.
Los tribunales han adoptado un principio de autorres-tricción respecto a la revisión de los laudos. En su origen, esta norma respondió al propósito de permitir el desarrollo de un sistema de arbitraje laboral.(63) La deferencia a las determinaciones del árbitro, según la norma de autorres-tricción, es tan amplia que un laudo no se puede anular por meros errores de hecho o derecho.(64) Sin embargo, esta norma general no se aplica con el mismo rigor si la parte que desea que se impugne el laudo argumenta cualquiera de las causas siguientes: (1) fraude, (2) conducta impropia, (3) falta de debido procedimiento en la celebración de la vista, (4) violación de la política pública, (5) falta de juris-dicción, y (6) que el laudo no resuelve todas las controver-sias que se sometieron.(65)
Si ninguna de las circunstancias mencionadas está pre-sente, los tribunales solo pueden revisar un laudo si al re-dactar la cláusula de arbitraje, o como parte del pacto de sumisión, las partes le impusieron al árbitro la obligación de resolver la controversia conforme a derecho.(66) Precisa- *370 mente, esta estipulación se incluyó en el convenio colectivo entre la SPU y la COPR.(67) Que el laudo se deba emitir conforme a derecho significa que los foros judiciales apela-tivos tendrán la autoridad para revisar todas las cuestio-nes de derecho sustantivo resueltas por el árbitro para po-der determinar si son correctas.(68) Sin embargo, hemos establecido claramente que los laudos tienen presunción de corrección, similar al que se atribuye a las determinaciones de las agencias administrativas o a las sentencias, por lo cual la autoridad para revisarlos no constituye una licencia para favorecer la nulidad del laudo. En estas circunstan-cias, el laudo solo se puede anular si no se ha resuelto la controversia conforme a derecho.(69)
Incluso, en casos en que el árbitro está obligado a resolver conforme a derecho, hemos reiterado la deferencia que merecen sus determinaciones y “nuestra norma de auto-rrestricción judicial, por lo que un laudo basado en una sumisión voluntaria está sujeto a la revisión judicial sólo si las partes convienen que la controversia sometida al árbi-tro sea resuelta conforme a derecho”. (Enfasis suplido y citas omitidas.)(70) Aun cuando proceda la revisión judicial del laudo, hemos hecho hincapié en que “no debemos incli-narnos fácilmente a decretar la nulidad de la decisión ar-bitral a menos que el árbitro haga caso omiso al derecho aplicable”.(71) En este caso no podemos concluir que la ár- *371 bitra haya ignorado el derecho aplicable al confeccionar el remedio otorgado.
A través de los años, este Tribunal se ha encargado de aclarar las implicaciones jurídicas de la obligación de resolver conforme a derecho. Inicialmente, establecimos que
[condicionar un laudo a que sea] “conforme a derecho” ... “sig-nifica que el árbitro no puede ignorar las normas interpreta-tivas de derecho sustantivo emitidas por los Tribunales Supremos de Estados Unidos y Puerto Rico en el campo de derecho laboral, y que se reputarán persuasivas las decisiones de los tribunales de primera instancia y de agencias administrati-vas, y los laudos y escritos de reputados árbitros.” (Énfasis suplido.(72)
Posteriormente, aclaramos que, al interpretar un conve-nio, el árbitro debe considerar, además de su contenido, otras normas interpretativas del derecho sustantivo labo-ral federal y local.(73) En otras palabras, la esencia del con-venio colectivo se extraerá no tan sólo de su contenido y del acuerdo de sumisión, sino de fuentes de derecho externas al contrato, pero relacionadas con la finalidad del mismo. A través de este proceso analítico, el árbitro definirá un re-medio que sea conforme tanto a la esencia del convenio como al pacto de sumisión.
Uno de los elementos externos al convenio que se deben considerar cuando este se interpreta es, sin duda, la nor-mativa de las relaciones laborales, lo cual incluye la filoso-fía constitucional de la negociación colectiva y los procedi-mientos que esta genera. Entonces, como el arbitraje laboral es el elemento práctico de la negociación colectiva, el árbitro, al emitir su laudo, debe ponderar la filosofía que emerge de este derecho constitucional así como la legisla-ción laboral que se encarga de implementarla.
También, si las partes optan por someterse al arbitraje del Negociado de Conciliación y Arbitraje del Departa- *372 mentó del Trabajo y Recursos Humanos, el reglamento de esta unidad administrativa será aplicable y el árbitro de-berá utilizarlo al interpretar el convenio para adjudicar la controversia y definir el remedio. Sobre el particular, en su Artículo IV(d) el reglamento establece que “[Z]a justicia, razonabilidad, prontitud y economía en el proceso prevale-cerán en la resolución de las controversias”. (Enfasis suplido.(74)
Otro factor externo que el árbitro debe considerar, al tratar de precisar la esencia del convenio colectivo y el acuerdo de sumisión, es la jurisprudencia del Tribunal Supremo de Estados Unidos y del Tribunal Supremo de Puerto Rico. Esto, porque la normativa que ha sustentado el sistema de arbitraje obrero-patronal se ha elaborado, casi en su totalidad, no a nivel legislativo, sino por la vía judicial.(75)
E. La concesión de remedios cuando se resuelve “conforme a derecho”(76)
Explicado lo anterior, debemos examinar la extensión de la facultad del árbitro para diseñar remedios y, en particular, si la frase “conforme a derecho” tiene el efecto de limi-tar dicha facultad al grado que lo hace la opinión mayori-taria, aunque se trate de una relación laboral regida por un convenio. Más específicamente, si el término “conforme *373 a derecho” implica que, ante el silencio del convenio sobre el remedio específico, el único remedio que puede conceder el árbitro en una controversia de despido injustificado es el que provee la Ley Núm. 80, es decir, el remedio exclusivo de la mesada, o si, por el contrario, el árbitro tiene la lati-tud necesaria para reinstalar al empleado e, incluso, orde-nar que se le paguen los salarios dejados de percibir.
La autoridad de un árbitro para emitir remedios, igual que su potestad para intervenir en una controversia, emana del convenio colectivo y el pacto de sumisión. A tra-vés de los años, la tendencia ha sido conferirle mayor poder a los árbitros en el diseño de un remedio adecuado a su laudo, siempre que el remedio se circunscriba esencial-mente a lo que mandan el convenio colectivo y el acuerdo de sumisión sometido por las partes.(77) El Tribunal Supremo de Estados Unidos ha reconocido, en este sentido, la flexibilidad necesaria que deben tener los árbitros al crear remedios, la cual debe surgir de la “esencia” (essence) del convenio. (Enfasis suplido.(78)
En iguales términos se expresó este Tribunal cuando determinamos que no era razonable que un árbitro tuviera “poder para entender en una controversia entre patrono y *374 unión sin tener autoridad para imponer el remedio que creyera propicio de acuerdo al laudo emitido”.(79) De esta forma, avalamos el remedio de daños y perjuicios que un árbitro le concedió a una organización obrera por conside-rar que el patrono intervino en la acción de descertiñcación de dicha unión. A este dictamen se llegó a pesar de que dicho remedio no estaba estipulado ni en el convenio colec-tivo ni en el acuerdo de sumisión y una cláusula de arbitraje establecía que el laudo se debía emitir conforme a derecho.(80) El análisis quería establecer que el único requi-sito que debe cumplir un árbitro al establecer un remedio es que este sea consustancial y afín a los propósitos de la ley y del convenio colectivo.(81) En definitiva, que el remedio no viole el convenio colectivo ni el pacto de sumisión.
Es importante señalar que el árbitro puede interpretar el silencio de las partes sobre una controversia en particular al confeccionar su remedio. Los tratadistas Elkouri nos dicen al respecto:
If a given type of remedy has been used widely by arbitrators, an exceedingly strong case may be made in support of an arbitrator’s right to use the remedy absent an express denial in the agreement or submission. The theory is that the parties may he presumed to have knowledge of arbitral practice, and their silence in their agreement on the subject implies their consent. (Enfasis suplido.(82)
Evidentemente, un lenguaje claramente restrictivo en el convenio colectivo o en el acuerdo de sumisión constituye un factor que limita la facultad del árbitro para elaborar remedios.(83) Sin embargo, en ausencia de prohibiciones ex- *375 presas, el árbitro tiene la obligación de cumplir con el man-dato del convenio y el pacto de sumisión, los cuales le im-ponen la obligación de buscar un remedio adecuado coherente con su esencia y la razón de ser de la negociación colectiva y el ámbito colectivo en general. Por eso, en el contexto de un despido injusto al amparo de un convenio colectivo, los árbitros pueden conceder remedios mayores que la indemnización económica de la Ley Núm. 80 de 1976, si sus facultades remediadoras no están limitadas expresamente.
No se trata de un planteamiento nuevo en nuestro de-recho laboral. Hemos resuelto que “[e]n ausencia de una disposición expresa en contrario en el convenio colectivo, el [árbitro tiene] facultad (1) para resolver que aun conside-rando ciertos los hechos en los cuales el patrono basaba el despido, ésta era una pena demasiado drástica, y (2) para modificar dicha pena”. (Enfasis suplido.) Junta de Reí. del Trabajo v. Soc. Mario Mercado e Hijos, 74 D.P.R. 403, 407 (1953). Es decir, lo que requería una disposición expresa en el convenio era la limitación a la facultad del árbitro. En ausencia de dicha limitación expresa, el árbitro podía mo-dificar un castigo impuesto por el patrono en el contexto de un despido. El silencio no era suficiente para truncar las facultades del árbitro, pues la interpretación liberal que exige el ordenamiento laboral nos obliga a interpretar el silencio a favor de reconocer mayores poderes remediado-res al árbitro para que este pueda corregir un capricho patronal. Esto, pues “es innegable la autoridad de un árbi-tro de variar la sanción disciplinaria si considera que la misma es muy severa y drástica”(84) como sería, por ejem-plo, sustituir un despido por una sanción menor.
*376 Este Tribunal ha recalcado consistentemente que en el contexto colectivo el árbitro tiene la facultad de reponer al empleado en su puesto y ordenar que se le pague el salario atrasado. Específicamente, hemos distinguido entre la po-lítica pública de la Ley Núm. 80 y las acciones por despido en el contexto de un convenio colectivo:
No discernimos disparidad entre la política del estatuto y el laudo emitido. No se nos ha demostrado que la intención legis-lativa haya sido fijar sanciones máximas exclusivas para casos de despido cuando media un convenio colectivo y un amplio acuerdo de sumisión sobre la justificación de la cesantía. ¿Cómo es que puede interpretarse que la legislación sobre la mesada ha obedecido por décadas al propósito de impedir que mi árbitro, bajo un acuerdo de sumisión que no limite clara-mente sus poderes, ordene la reposición de un empleado y el pago de los sueldos dejados de percibir, más intereses? En Puerto Rico, hemos distinguido tajantemente entre los dere-chos bajo un convenio colectivo y los derechos de mesada. (En-fasis suplido.) (85)
También, hace más de medio siglo resolvimos que “[n]aturalmente, en dichos convenios colectivos de trabajo, la ausencia de causa justa da derecho a la reposición y al pago de los salarios dejados de devengar, y no se trata pues de una simple cuestión de mesada ...”. (Enfasis suplido.)(86)
La decisión que hoy adopta el Tribunal vira al revés esta normativa. Ahora, se presume la limitación de las faculta-des del árbitro y lo que tiene que ser expreso no es la limi-tación de estas facultades, sino su concesión en el convenio. De esa forma, la mayoría convierte el silencio, no en un mandato para interpretar el convenio, sino en una prohi-bición de hacerlo. Y al resolver de esta forma, mediante alguna alquimia a la inversa, supuestamente fortalece “la política pública imperante en nuestra jurisdicción relacio- *377 nada con la importancia y el poder vinculante de la nego-ciación colectiva laboral”.(87)
La política pública laboral puertorriqueña rechaza los despidos injustificados y se inclina a favor de la protección del empleo existente. Por lo tanto, tiene como objetivo el que los despidos sean por justa causa. Esa es la política pública, tanto en el ámbito individual, mediante la Ley Núm. 80, como en el colectivo. Lo que marca la diferencia en cada ámbito es el remedio que se provee ante un des-pido injustificado. Sabemos que en el ámbito individual de la relación laboral contractual, la Ley Núm. 80 provee el remedio máximo que los empleados pueden obtener ante un despido injustificado.(88) Sin embargo, este remedio re-presenta el mínimo que se puede conceder a los empleados que componen el ámbito colectivo.(89) Esto, porque un con-venio colectivo puede mejorar, pero nunca disminuir, el es-tándar mínimo de empleo establecido por la ley laboral estatal.(90) Al respecto, las Guías para la Interpretación y Aplicación de la Ley Núm. 80 indican:
La protección que brinda la Ley Núm. 80, supra, a los traba-jadores no puede eliminarse mediante convenio colectivo. Esto significa que mediante el proceso de negociación colectiva puede disponerse como mínimo, ante un despido injustificado, el remedio que dispone dicha Ley. Las partes tienen la potestad de pactar cualquier remedio que supere el que dispone la Ley Núm. 80, supra, más no uno menor. (Enfasis suplido.)(91)
*378 Precisamente, lo que brinda a un laudo la cualidad de ser “conforme a derecho” es su coherencia con la política pública laboral. No hay base jurídica para concluir que la finalidad de la Ley Núm. 80 es afectar la libertad del árbitro para conceder un remedio más justo y coherente con el ámbito colectivo, como tampoco para pensar que cuando el árbitro otorga el remedio de restitución y paga atrasada no está actuando conforme a derecho. (92) Más bien, la posibilidad de dicho remedio es inherente a la facultad del árbitro de re-mediar un despido prohibido por el convenio. (93) Resolver lo contrario, por un lado, desnaturalizaría la Ley Núm. 80 y, por el otro, impediría que se cumpla efectivamente con la política pública laboral. Es por eso que un árbitro que concede un remedio más beneficioso para el obrero no actúa contrario a derecho, siempre que al hacerlo cumpla con la política pública laboral y el convenio entre las partes.(94)
Es cierto que si el convenio colectivo no define lo que constituye justa causa y la cláusula de arbitraje requiere que el laudo sea emitido conforme a derecho, el árbitro está obligado a examinar la definición que de este término jurí- *379 dico contenida en la Ley Núm. 80 y la jurisprudencia que la interpreta. Esta definición recoge la política pública re-lacionada con el asunto y el árbitro la debe utilizar de forma que nutra no tan solo la letra del convenio, sino tam-bién su esencia.(95)
Ello no quiere decir, sin embargo, que el árbitro esté limitado al remedio que provee este estatuto.(96) El remedio pautado en la Ley Núm. 80 no define política pública, más bien es el reconocimiento de que la política pública laboral de protección de empleo es de menor intensidad en el ám-bito individual de la relación laboral. Por el contrario, la inclusión en el convenio colectivo del requisito de justa causa para el despido conlleva los remedios de reinstala-ción y de paga atrasada dejada de percibir, precisamente porque la política pública laboral de protección de empleo es de mayor intensidad en el ámbito colectivo de la relación laboral. Desafortunadamente, la opinión mayoritaria con-funde estos conceptos y no distingue entre derecho sustan-tivo y remedios en cuanto al requisito de “conforme a derecho”.
Los trabajadores se organizan sindicalmente para nego-ciar colectivamente un convenio colectivo que les proteja. Por eso, ante el enorme poder de despedir que tienen los patronos, la inmensa mayoría de los convenios colectivos contienen la limitación expresa de que los despidos no pue-den ser injustificados. Si un convenio colectivo incluye una cláusula que requiera justa causa para el despido, los ár- *380 bitros deben velar por su estricto cumplimiento.(97) Especí-ficamente, el tratadista Fairweather expone:
... labor agreements negotiated with unions usually have provided that employees may be discharged only for just cause. It is this provision that generates reinstatement as the remedy for a discharge when an arbitrator finds that the discharge was not for just cause.(98)
Cabe señalar que aim cuando un convenio no incluya expresamente una disposición de justa causa para el des-pido, la práctica arbitral es resolver que está incluida im-plícitamente en todos los convenios colectivos. Sobre el particular, la Prof. Martha West, citando a Elkouri y Elkouri, expone:
Most collective agreements require “cause” or “just cause” for discharge or discipline. Even in the absence of an express “just cause” limitation, arbitrators will imply such a limitation on discharge. (Enfasis suplido.)(99)
Según explica el tratadista Brand, para muchos árbitros la limitación de justa causa para el despido es parte esen-cial e implícita de todo contrato colectivo y es central a su decisión cuando juzgan las acciones de los patronos.(100) La lógica subyacente a esta presunción es que si el patrono pudiera despedir a sus trabajadores en cualquier momento y por cualquier causa, entonces no tendrían mucho valor las disposiciones contractuales que regulan la antigüedad y otras protecciones contenidas en los convenios colectivos. Tratándose, pues, de una presunción, si las partes quieren alterarla deben expresarlo claramente en su convenio.
*381 Ciertamente, la inexistencia de justa causa en un des-pido viola la política pública laboral en contra de los despi-dos caprichosos y en defensa del trabajo. Un laudo que tolera el despido sin justa causa viola esta política pública y el árbitro que lo emite, al no actuar de acuerdo a ésta, no actúa conforme a derecho. Tampoco lo hace si ordena el pago de la mesada, en vez del remedio de reposición en el empleo, aun cuando el convenio particular no lo requiera expresamente. Si la política pública laboral del país es pro-teger el empleo existente o su tenencia, un laudo que ante un despido injustificado ordena la reposición del empleado, lejos de contradecir esta política pública, la fortalece. Esa determinación del árbitro es, pues, conforme a la ley y no está en conflicto explícito ni implícito con otras leyes y pre-cedentes legales en el ámbito colectivo de nuestro sistema de relaciones del trabajo.
Muchos especialistas del Derecho Laboral entienden que hoy la reinstalación del empleado es el remedio universal del arbitraje en caso de despido injustificado.(101) Se trata de la consecuencia lógica y esperada del hallazgo del árbitro que, por un lado, identifica la ausencia de justa causa para el despido y, por el otro, al darse la acción pa-tronal en un contexto colectivo, reconoce que dicha acción, al ser contraria al convenio, no causó una ruptura de la relación contractual, por lo cual los derechos de empleo siguen intactos. En palabras del tratadista Fairweather:
... Under this system, it is technically more accurate to say that an employee who was discharged not for just cause was not in fact discharged, and hence the employment relationship
*382 set out in the seniority provisions in the labor agreement was not broken.(102)
Hence, “reinstatement” by an arbitrator is simply a finding that under the labor agreement just cause was not present and contractual employment rights remain in effect; that is, no effective severance by discharge occurred. (Énfasis suplido.)(103)
Se trata, en definitiva, de proveer lo que se conoce como “make whole remedies”.(104) Brand explica este término de la forma siguiente:
Arbitrators uniformly hold that an employee who is discharged without just cause is entitled to a “make whole” remedy. The make whole remedy attempts to place the employee in the same position she would have been in if the improper discipline had not occurred. (Énfasis suplido.)(105)
También indica este autor lo siguiente: “[;Reinstatement is the central and most common element of the modern remedy for discharge without just cause.” (Enfasis suplido.)(106) Además, señala que la paga atrasada es otro componente esencial de un remedio comprensivo:
Back pay is the other essential component of a make whole remedy. The purpose of the back pay is “to make the employee whole for the loss sustained by his discharge” and to “put him in exactly the same position financially that he would have been in had the discharge not occurred.” In addition to making the grievant whole, back pay may serve a public policy of objective deterrence.(107)
*383 De esta forma, el laudo coherente, en ausencia de situa-ciones particulares, siempre unirá la reinstalación del em-pleado en su puesto con el pago de los haberes dejados de otorgar.(108) La autoridad para hacerlo proviene y está im-plícita en el poder del árbitro de determinar si existe “su-ficiente causa” para apoyar la medida disciplinaria que ha impuesto el patrono. Al igual que la relación entre el as-censo y el aumento de sueldo, difícilmente puede lograr la reinstalación su objetivo restaurador sin la compensación debida al empleado despedido injustamente
... cuando el árbitro decide que el despido fue impropio, puede ordenar la reinstalación con paga atrasada, total, parcial o ninguna.
El propósito de la paga atrasada es compensar al empleado en la pérdida de salarios que ha incurrido como consecuencia de la violación del convenio colectivo por el patrono; es restau-rar el status quo económico.(109)
En definitiva, la doctrina reconoce al árbitro la potestad de conceder el remedio de la reinstalación y la paga atra-sada a los empleados organizados sindicalmente, porque al despedir injustificadamente a un empleado unionado, el patrono viola el convenio, lo cual constituye una práctica ilícita de acuerdo con la Ley Núm. 130.(110) Además, la esencia de la negociación colectiva es proteger el empleo existente y mejorar las condiciones de empleo y sueldo de los obreros.(111) Al reponer al empleado y ordenar pagarle la paga atrasada, el árbitro no está enmendando o modifi-cando las disposiciones del convenio, sino reparando la *384 falta del patrono y regresando la relación contractual a la situación existente antes del despido.
Por consiguiente, considero que la frase “conforme a de-recho” no implica una limitación a la facultad que tiene el árbitro para elaborar remedios, máxime cuando el pacto de sumisión solicita que se provea el remedio adecuado y el convenio no establece expresamente los remedios que se excluyen de su discreción. Esta frase lo único que significa es que el laudo emitido, conjuntamente con la parte dispo-sitiva del remedio, tiene que ser fiel a la esencia del conve-nio colectivo y al pacto de sumisión. Ello se logra interpre-tando el contenido del convenio y del acuerdo de sumisión a la luz de la normativa laboral federal y local pertinente.
En ese sentido, plantear que el pago de la mesada es el único remedio aplicable al ámbito colectivo, porque el con-venio requiere que el laudo sea conforme a derecho, es del todo incoherente. El remedio de la mesada es extraño al contexto unionado, donde existe un convenio colectivo para evitar la acción unilateral patronal. La mesada es el reme-dio mínimo concedido por la legislación social del trabajo en el ámbito individual. En el ámbito colectivo existe la posibilidad expresa o implícita de remedios más abarcado-res que esa exigua indemnización económica. (112)
*385 III
AI examinar en conjunto las cláusulas del convenio co-lectivo de la SPU y la COPR, se puede observar claramente que, por un lado, estas establecen que el laudo deberá ser conforme a derecho y, a la vez, sólo permiten el despido por justa causa.(113)
Al despedir al señor Lugo Reyes injustificadamente, la SPU incurrió en una práctica ilícita, pues violentó los tér-minos del convenio colectivo con la COPR. Aplica, pues, la Ley Núm. 130, que establece la restitución del empleado como remedio ante dicho capricho patronal. Siendo ello así, resolver “conforme a derecho” no se limita a estudiar úni-camente la Ley Núm. 80, como concluye la mayoría.
La Ley Núm. 80 de 1976 no está incluida en el marco decisional arbitral que tiene lugar al amparo de un conve-nio colectivo precisamente porque no aplica al contexto co-lectivo de empleados organizados. Resolver lo contrario so-cava la institución de la negociación colectiva y pervierte la política pública que favorece la concertación de convenios y sus mecanismos para solucionar controversias. También destruye el delicado balance entre el derecho del patrono a escoger sus empleados y la política pública laboral de pro-teger el trabajo existente y repudiar los despidos injustos. Al aplicar la Ley Núm. 80 al contexto laboral colectivo se subvierte la naturaleza protectora que ésta ejerce en el ámbito individual para convertirla en un estatuto que li-mita los derechos adquiridos a través de la negociación colectiva.
Al amparo de la Ley Núm. 130 y la política pública labo-ral, la árbitra Guzmán Rodríguez tenía la obligación, con- *386 forme al derecho vigente, de reparar el daño que ocasionó la SPU al despedir sin justa causa al señor Lugo Reyes. La única forma de reparar ese daño era regresar la situación a las condiciones materiales y económicas prevalecientes antes de la ocurrencia del acto disciplinario, protegiendo el tra-bajo que disfrutaba el señor Lugo Reyes y reponiéndole en su puesto con la paga de los salarios dejados de devengar.
La decisión de la mayoría de este Tribunal ha dejado a las trabajadoras y los trabajadores en Puerto Rico más vul-nerables al capricho patronal. Por eso y porque es inco-rrecta en derecho, disiento.

 El sector público tiene también estos dos ámbitos, aunque con algunas variantes.

 Véase I. Rivera García, Diccionario de Términos Jurídicos, 3ra ed., San Juan, LexisNexis, 2000, pág. 54. A este concepto también se le conoce como “contrato de trabajo” y se le define de la forma siguiente:
“Es aquel por el cual una persona (llamada trabajador) se obliga, mediante una retribución, a prestar un servicio personal a otra (llamada patrono), bajo la depen-dencia permanente y dirección inmediata o delegada de ésta.” F. Velázquez, Diccio-nario Laboral, Hato Rey, Master Typesetting, 1978, pág. 73.

 Más técnicamente, un contrato colectivo se define como sigue:
“Es todo acuerdo escrito relativo a las condiciones de trabajo, celebrado entre un empleador (patrono), un grupo de empleadores, o una o varias organizaciones de empleadores, por una parte, y, por otra parte, una o varias organizaciones represen-tativas de los trabajadores interesados.” Velázquez, op. cit., pág. 73.

 Véase: A. Acevedo Colom, Legislación Protectora del Trabajo Comentada, 8va ed., San Juan, Ramallo Printing Bros., 2005, pág. 5; R.N. Delgado Zayas, Apuntes para el estudio de la legislación protectora del trabajo en el derecho laboral puerto-rriqueño, San Juan, Ramallo Printing Bros., 2005, págs. 2-3. Los derechos laborales constitucionales a los cuales nos referimos son:
“Se reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella, a recibir igual paga por igual trabajo, a un salario mínimo razo-nable, a protección contra riesgos para su salud o integridad personal en su trabajo o empleo, y a una jornada ordinaria que no exceda de ocho horas de trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compensación extraordi-naria que nunca será menor de una vez y media el tipo de salario ordinario, según se disponga por ley.” Art. II, Sec. 16, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 369.

 Delgado Zayas, op. cit., pág. 2. La Legislación Protectora del Trabajo aplica solamente a los empleados del sector privado y a las corporaciones públicas que funcionan como negocios privados. Acevedo Colom, op. cit., pág. 5.

 Delgado Zayas, op.cit., pág. 3.

 íd., pág. 2; Acevedo Colom, op. cit, pág. 5.

 Delgado Zayas, op. cit., pág. 3.

 Delgado Zayas, op.cit., págs. 4-15.

 29 L.P.R.A. secs. 185a-185m.

 Aunque, si los patronos despiden a sus empleados del sector privado en violación de ciertas leyes federales y estatales, estos tendrán derecho a ser reinsta-lados en sus puestos. Entre las leyes que proveen estos remedios se encuentran: (1) Ley Núm. 3 de 13 de marzo de 1942, según enmendada, conocida como Ley de Pro-tección de Madres Obreras, 29 L.P.R.A. secs. 467-474; (2) Ley Núm. 100 de 30 de junio de 1959, según enmendada, conocida como Ley contra Discrimen en el Empleo, 29 L.P.R.A. secs. 146-151; (3) Ley Núm. 45 de 18 de abril de 1935, según enmendada, conocida como Ley del Sistema de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 1 et seq.; (4) Ley Núm. 69 de 6 de julio de 1985, conocida como Ley contra el Discrimen en el Empleo por Razón de Sexo, 29 L.P.R.A. sec. 1321 et seq.; (5) Ley Núm. 138 de 26 de junio de 1968, según enmendada, conocida como Ley de Protección Social por Accidentes de Automóviles, 9 L.P.R.A. sec. 2051 et seq.; (6) Ley Núm. 17 de 22 de abril de 1988, conocida como Ley contra el Hostigamiento Sexual en el Empleo, 29 L.P.R.A. sec. 155 et seq. Véanse: Acevedo Colom, op. cit., págs. 165-174; Delgado Zayas, op. cit., págs. 112-114.

 Exposición de Motivos de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, 1976 Leyes de Puerto Rico 268.

 C. Zeno Santiago, El despido y la política social en nuestro estado de derecho, 34 (Núm. 2) Rev. Jur. U.I.P.R. 213, 219-220 (2000).

 Historial Legislativo del P. del S. 1112, que se convirtió en la Ley Núm. 80 de 30 de mayo de 1976, Diario de Sesiones de la Asamblea Legislativa, 24 de mayo de 1975, pág. 3.

 íd., págs. 6-7.

 Historial Legislativo del P. de la C. 631, Ley Núm. 128 de 7 de octubre de 2005, Diario de Sesiones de la Cámara de Representantes, 29 de agosto de 2005, págs. 2-3.

 Las relaciones obrero-patronales “[¡Incluyen la negociación colectiva, la re-solución de diferencias resultantes de la interpretación y aplicación del convenio, términos y condiciones de trabajo”. Velázquez, op. cit., pág. 228.

 La Ley Núm. 80 de 30 de mayo de 1976 (Ley Núm. 80) es una modificación de la doctrina del empleo a voluntad (employment at will) de Estados Unidos. En términos generales, los empleados contratados bajo esta doctrina no tienen derecho legal a la seguridad y continuidad de su empleo. Los pueden despedir en cualquier momento o por cualquier razón, por justa causa o sin ella, siempre y cuando no cuenten con un contrato a término fijo, sin que puedan llevar alguna acción legal en contra del patrono. Esta ley modifica esta doctrina de inseguridad laboral y le im-pone al patrono el pago de una mesada cuando el despido es injustificado. Véanse: Otero Burgos v. Inter American University, 558 F. 3d 1, 7-8 (1er Cir. 2009); Hoyos v. Telecorp Communications, Inc., 488 F. 3d 1, 6 (1er Cir. 2007); Barreto v. ITT World Directories, Inc. 62 F.Supp. 2d 387, 394 (D. P.R. 1999). Véase, además, Delgado Za-yas, op. cit., págs. 110-111.

 29 L.P.R.A. sec. 61 et seq.; D. Fernández y C. Romany, Derecho laboral: Casos y Materiales, Río Piedras, Ed. U.P.R., 1987, T. I, pág. 39.

 E. López Ruyol, El A, B, C del movimiento obrero, Carolina, Instituto Técnico Sindical, 1998, pág. 201.

 29 L.P.R.A. sec. 62(5). Véanse, además: J.R.T. v. Junta Adm. Muelle Mun. de Ponce, 122 D.P.R. 318, 330 (1988); Nazario v. Tribunal Superior, 98 D.P.R. 846, 851 (1970); P.R. Telephone v. Junta Rel. Trabajo, 86 D.P.R. 382, 395 (1962).

 U.I.L. de Ponce v. Dest. Serrallés, Inc., 116 D.P.R. 348, 352 (1985).

 J.R.T. v. Vigilantes, Inc., 125 D.P.R. 581, 592 (1990); J.R.T. v. Corp. de Crédito Agrícola, 124 D.P.R. 846, 849 (1989); J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra, pág. 333; Nazario v. T'ibunál Superior, supra, pág. 853; Rivera Adorno v. Autoridad de Tierras, 83 D.P.R. 258, 264 (1961).

 M. Alonso García y otros, La solución de los conflictos colectivos de trabajo, Madrid, Instituto de Estudios Económicos, 1979, pág. 92.

 U.I.L. de Ponce v. Dest. Serrallés, Inc., supra, pág. 352.

 29 L.P.R.A. sec. 65.

 Velázquez, op. cit., pág. 256. Véase 29 L.P.R.A. sec. 63(10).

 29 L.P.R.A. sec. 62(3); C. Zeno Santiago y V.M. Bermúdez Pérez, Tratado de Derecho del Trabajo, San Juan, Pubs. J.T.S., 2003, T. I, pág. 33. De lo contrario, la unión “no pasará de ser un club o asociación cívica, a pesar de lo rimbombante del nombre que utilice”. E. López Ruyol, op. cit., pág. 62.

 Art. II, Sec. 17, Const. E.L.A., supra, pág. 375.

 Art. II, Sec. 18, Const. E.L.A., supra, pág. 377.

 3 Diario de Sesiones de la Convención Constituyente 1622 (1952).

 Diario de Sesiones, supra, Vol. 4, pág. 2574.

 J.R.T. v. Vigilantes, Inc., supra, págs. 590, 592-593.

 Acevedo Colom, op. cit., pág. 165. Véase, además, Zeno Santiago y Bermúdez Pérez, op. cit., págs. 152, 162.

 A. Torres Rivera, Despido y derecho a reposición y paga retroactiva cuando el convenio colectivo requiere que el laudo sea conforme a derecho: Desde el Arbitraje Laboral, 67 (Núm. 4) Rev. C. Abo. P.R. 188 (2006), citando la comparecencia del Secretario del Trabajo y Recursos Humanos, Román Velazco, ante el Tribunal Supremo como amicus curiae en el caso H.I.E.Tel. v. Celulares, 169 D.P.R. 1 (2006).

 Vélez Rodríguez v. Pueblo Int’l, Inc., 135 D.P.R. 500, 511 esc. 11 (1994).

 Citando a Rivera v. Security Nat. Life Ins. Co., 106 D.P.R. 517 (1977). Wolfe v. Neckwear Corp. of P.R., 80 D.P.R. 537 (1958).

 D. Fernández Quiñones, El arbitraje obrero-patronal, Colombia, Ed. Forum, 2000, págs. 18-19.

 Colón Molinary v. A.A.A., 103 D.P.R. 143, 146 esc. 1 (1974). Un ejemplo del arbitraje obrero-patronal compulsorio es el que está incluido en la Ley Núm. 45 de 25 de febrero de 1998, que es el estatuto que le garantiza el derecho a negociar colecti-vamente a los empleados del sector público que trabajan en las agencias del gobierno central, pero que no tienen el derecho de participar en huelgas.

 López Ruyol, op. cit., pág. 76. Véase, además, H.R. Cando, El arbitraje obrero-patronal en Puerto Rico, Instituto de Relaciones del Trabajo, Universidad de Puerto Rico, 1953, pág. 14; D.M. Helfeld, La jurisprudencia creadora: factor deter-minante en el desarrollo del derecho de arbitraje en Puerto Rico, 70 (Núm. 1) Rev. Jur. U.P.R. 1, 5 (2001).

 C.F.S.E. v. Unión de Médicos, 170 D.P.R. 443, 448 (2009); U.G.T. v. Corp. Difusión Púb., 168 D.P.R. 674, 682 (2006); Martínez Rodríguez v. A.E.E., 133 D.P.R. 986, 995 (1993); J.R.T. v. Corp. Crédito Agrícola, supra, pág. 849.

 C.F.S.E. v. Unión de Médicos, supra, pág. 449; U.G.T. v. Corp. Difusión Púb., supra, pág. 682; J.R.T. v. Hato Rey Psychiatric Hosp., 119 D.P.R. 62, 68 (1987); U.I.L. de Ponce v. Dest. Serrallés, Inc., supra, págs. 353-354; S.I.U. de P.R. v. Otis Elevator Co., 105 D.P.R. 832, 836 (1977); Nazario v. Tribunal Superior, supra, pág. 851.

 Cancio, op. cit, págs. 25 y 81. Véanse, además: Steelworkers v. Warrior & Gulf Co., 363 U.S. 574, 578 (1960); Steelworkers v. Enterprise Corp., 363 U.S. 593 (1960).

 Condado Plaza v. Asoc. Emp. Casinos P.R., 149 D.P.R. 347, 352 (1999); D. Fernández Quiñones, Análisis del Término 2006-2007 Tribunal Supremo de Puerto Rico: derecho laboral, 77 (Núm. 3) Rev. Jur. U.P.R. 677, 679 (2008).

 Velázquez, op.cit., pág. 27. Véase, además, A. Merchán Álvarez, El Arbitraje: Estudio Histérico-jurídico, Pubs, de la Universidad de Sevilla, 1981, págs. 67-77.

 D. Fernández Quiñones, La legitimación del arbitraje obrero-patronal, 62 (Núms. 3 y 4) Rev. C. Abo. P.R. 444, 451-452 (2001).

 U.G.T. v. Corp. Difusión Púb., supra, pág. 683; Sonic Knitting Industries v. I.L.G.W.U., 106 D.P.R. 557, 562 (1977); Colón Molinary v. A.A.A., supra, págs. 148-149; López v. Destilería Serrallés, 90 D.P.R. 245, 256 (1964); Junta de Relaciones del Trabajo v. N.Y. & P.R. S/S Co., 69 D.P.R. 782, 802 (1949). Véase, además, Steelworkers v. Enterprise Corp., supra, pág. 597.

 F. Elkouri y E. Elkouri, How Arbitration Works, 6ta ed., (A.M.Ruben, ed.) Washington, D.C., BNA Books, 2003, pág. 486.

 Exhibit I del recurso de revisión ante el TPI presentado por la SPU, Artículo X: Quejas y Agravios y Arbitraje, H (Tercer Paso), Convenio Colectivo entre y por Servidores Públicos Unidos de Puerto Rico AFSCME, AFL-CIO y la Confederación de Organizadores de Puerto Rico, 10 de junio de 2004, pág. 135.

 Art. 111(a) del Reglamento para el Orden Interno de los Servicios de Arbi-traje del Negociado de Conciliación y Arbitraje del Departamento del Trabajo y Re-cursos Humanos, Reglamento Núm. 6065 de 27 de septiembre de 1999, pág. 2.

 íd., Art. 11(9), pág. 2.

 íd., Art. IX(b), págs. 6-7.

 Apéndice I del Recurso de certiorari, pág. 3.

3) J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra, pág. 331, citando a F. Shulman, Reason, Contract and Law in Labor Relations, 68 Harv. L. Rev. 999 (1955); A.M. Zack y R.I. Bloch, Labor Agreement in Negotiation and Arbitration, Washington, D.C., BNA Books, 1983, pág. 102.

 Fernández Quiñones, El arbitraje obrero-patronal, op. cit., pág. 199.

 J.R.T. v. Vigilantes, Inc., supra, pág. 586; J.R.T. v. Junta Adra. Muelle Mun. de Ponce, supra, pág. 331; AMA. v. J.R.T., 114 D.P.R. 844, 847 (1983). Véase, además, Fernández Quiñones, El arbitraje obrero-patronal, op. cit., págs. 199-207.

 J.R.T. v. Junta Adm. Muelle Mun. de Ponce, supra, págs. 330-331; J.R.T. v. National Packing Co., 112 D.P.R. 162, 166 (1982); Steelworkers v. Enterprise Corp., supra, pág. 597.

 Opinión del Tribunal, pág. 327.

 íd., pág. 332.

 íd., págs. 315-319.

 Junta Relaciones del Trabajo v. N.Y. & P.R. SIS, Co., supra, pág. 800. Véanse: U.G.T. v. Challenger Caribbean Corp., 126 D.P.R. 22, 29 (1990); Junta de Rel. del Trabajo v. Soc. Mario Mercado e Hijos, 74 D.P.R. 403, 412 (1953).

 Fernández Quiñones, El arbitraje obrero-patronal, op. cit., pág. 10.

 U.G.T. v. Corp. Difusión Púb., supra, pág. 682; J.R.T. v. Corp. Crédito Agrícola, supra, 849. Véase, además, Helfeld, op. cit., pág. 8.

 Febus y Otros v. MARPE Const. Corp., 135 D.P.R. 206, 218 (1994); J.R.T. v. Cooperativa Cafeteros, 89 DPR 498, 503 (1963); Rivera Adorno v. Autoridad de Tierras, 83 DPR 258, 266 (1961); Junta de Reí. del Trabajo v. Orange Crush ofP.R., 80 D.P.R. 292, 295 (1958); Junta Relaciones del Trabajo v. N.Y. & P.R. S/S, Co., supra, pág. 800; Ríos v. Puerto Rico Cement Corp., 66 D.P.R. 470, 477-78 (1946).

 C.F.S.E. v. Unión de Médicos, supra, pág. 449; Condado Plaza v. Asoc. Emp. Casino P.R., supra, pág. 353; J.R.T. v. Junta Adm. Muelles Mun. de Ponce, supra, pág. 325; J.R.T. v. Hato Rey Psychiatric Hosp., supra, pág. 68; U.I.L. de Ponce v. Dest. Serrallés, Inc., supra, págs. 352 y 353 esc. 2; Junta Relaciones del Trabajo v. N.Y. & P.R. S/S, Co., supra, pág. 800.

 C.F.S.E. v. Unión de Médicos, supra, pág. 449; U.G.T. v. Corp. Difusión Púb., supra, pág. 682; Condado Plaza v. Asoc. Emp. Casino P.R., supra, pág. 349; J.R.T. v. Corp. Crédito Agrícola, supra, pág. 849; J.R.T. v. Hato Rey Psychiatric Hosp., supra, pág. 67; U.I.L. de Ponce v. Dest. Serrallés, Inc., supra, págs. 352-353; J.R.T. v. Na *370 tional Packing Co., supra, pág. 165; J.R.T. v. Securitas, Inc., 111 D.P.R. 580, 582 (1981).

 Artículo X: Quejas y Agravios y Arbitraje, Tercer Paso (5), Convenio Colectivo entre Confederación de Organizadores de Puerto Rico y Servidores Públicos Unidos de Puerto Rico/Concilio 95/AFSCME, AFLCIO, pág. 13, 15 de septiembre de 2000.

88) Condado Plaza v. Asoc. Emp. Casino P.R., supra, pág. 353; J.R.T. v. Junta Adm. Muelles de Ponce, supra, pág. 326; S.I.U. de P.R. v. Otis Elevator Co., supra, pág. 836; U.I.L. de Ponce v. Dest. Serrallés, Inc., supra, pág. 353; J.R.T. v. Securitas, Inc., supra, pág. 582.

89) U.G.T. v. Corp. Difusión Púb., supra, pág. 683; U.C.P.R. v. Triangle Engineering Corp., 136 D.P.R. 133, 142-143 esc. 7; Febus y otros v. MARPE Const. Corp., supra; Rivera v. Samaritano & Co., Inc., 108 D.P.R. 604, 608 (1979).

 U.G.T. v. Corp. Difusión Púb., supra, pág. 682.

 íd., pág. 683.

 Aut. Edif. Púb. v. Unión Indep. Emp. A.E.P., 130 D.P.R. 983, 988 (1992). Véase J.R.T. v. Hato Rey Psychiatric Hosp., supra, pág. 68.

 Condado Plaza v. Asoc. Emp. Casino P.R., supra, pág. 351.

 Art. IV del Reglamento 6065, supra, pág. 3.

 Helfeld, op. cit., pág. 7.

 La noción de que los árbitros deben actuar de acuerdo con la ley es tan antigua como para ser mencionada en normativa legal desde finales del siglo XIX. P.G. Phillips, Rules of Law or Laissez-Faire in Commercial Arbitration, 47 (Núm. 4) Harv. L. Rev. 590, 603-604 escs. 83-84 (1934-1935), citando a Mickles v. Thayer, 14 Allen 114, 119 (Mass. 1867), y a White Star Mining Co. v. Hultberg, 220 Ill. 578, 77 N.E. 327 (1906).
“... the sumission required the arbitrators to ‘determine all questions according to rules of law and equity, the same as though the matter was to be tried in a court of law or equity’, but the court held that these words were directory only and left the arbitrators ‘to be the ultimate judges as to how the matter would be tried in a court of law or equity, and thus makes their decision final and conclusive.” Id., pág. 604, citando a Greenough v. Rolfe, 4 N.H. 357 (1828); Prescott v. Fellows, 41 N.H. 9 (1860); Matter of Couperie Beige Americaine, S.A., N.Y.L.J., 19 de enero de 1934, pág. 307.

 S.I.U. de P.R. v. Otis Elevator Co., supra, págs. 840-842; United Steelworkers v. Enterprise Corp., supra, pág. 597.

 Steelworkers v. Enterprise Corp., supra, pág. 597, según citado por Elkouri y Elkouri, op. cit., pág. 1189. Véase, además, Challenger Caribbean v. Union General de Trabajadores, 903 F.2d 857, 860-861 (1er Cir. 1990):
“An ‘arbitrator’s award settling a dispute with respect to the interpretation and [the] application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator’s own notions of industrial justice.’ [Paperworkers v.] Misco, 484 U.S. [29,] 38 [(1987)]. When an award ‘manifest^] an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.’ [Steelworkers v. Enterprise] Corp., 363 U.S. [593,] 597 [(1960)].
“[We do not sit as a court of appeal to hear claims of factual or legal error by an arbitrator or to consider the merits of the award. We cannot vacate the award because the arbitrator misreads the contract, where there is room to do so, nor are we authorized to reject his honest judgment as to the appropriate remedy, if the contract gives him authority to decide that question. ‘As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convincend he committed serious error does not suffice to overturn his decision’.]”

 Sonic Knitting Industries v. I.L.G.W.U., supra, págs. 563-564.

 íd., pág. 563.

 S.I.U. de P.R. v. Otis Elevator Co., supra, pág. 841.

 Elkouri y Elkouri, op. cit., pág. 1190.

 Sonic Knitting Industries v. I.L.G.W.U., supra, pág. 562, citando a Lodge # 12, District # 37, International Ass’n of Machinists v. Cameron Iron Works, Inc., 292 F.2d 112, 119 (5to Cir.), cert. denegado, 368 U.S. 926 (1961); College Hall Fashions v. Philladelphia, etc., 408 F.Supp. 722, 728 (E.D. Pa. 1976); Texas Gas Transmission *375 Corp. v. International Chem. Wkrs., 200 F.Supp. 521, en reconsideración, 527 (S.D. N. Y. 1962); Stutz, Arbitrators and the Remedy Power, Labor Arbitration and Industrial Change, National Academy of Arbitrators, Proceedings 16th Annual Meeting, 1963, pág. 54. Véanse, además: J.R.T. v. National Packing Co., supra, págs. 165 y 166; Steelworkers v. Enterprise Corp., supra, pág. 597; Junta Reí. del Trabajo v. Soc. Mario Mercado e Hijos, supra, pág. 407.

 Colón Molinary v. A.A.A., supra, pág. 154.

B) J.R.T. v. Securitas, Inc., supra, pág. 583.

 J.R.T. v. Securitas, Inc., supra, pág. 583, citando a Wolfe v. Neckwear Corp. of P.R., 80 D.P.R. 537, 543 (1958).

 Opinión mayoritaria, pág. 346.

 El Tribunal Federal de Apelaciones para el Primer Circuito concluyó que la Asamblea Legislativa concibió la Ley Núm. 80, que aplica a los empleados individua-les no organizados, “as a remedial measure that would provide employees with a baseline level of economic protection from the consequences of arbitrary dismissals”. (Enfasis suplido.) Otero-Burgos v. Inter American University, supra, pág. 8.

 íd., pág. 9.

 J.R.T. v. Vigilantes, Inc., supra, pág. 590. Véase, además, Challenger Caribbean v. Union Gen. de Trabajadores, supra, pág. 869.

 Guía para la Interpretación y Aplicación de la Ley Núm. 80: aprobada el día 30 de mayo de 1976, San Juan, Departamento del Trabajo y Recursos Humanos, Oficina del Procurador del Trabajo, pág. 58.

 Los tribunales de Estados Unidos han resuelto que la Ley Núm. 80 no se creó para interferir con la versión de la National Labor Relations Act, que en Puerto Rico es la Ley Núm. 130 de 1945 y que en el argot de estudiosos de relaciones laborales se conoce como una pequeña Ley Wagner, al igual que otras leyes similares en muchos estados de Estados Unidos. Otero-Burgos v. Inter American University, supra, pág. 9, citando a Hosp. Cristo Redentor, Inc. v. N.L.R.B., 488 F.3d 513, 524 (ler Cir. 2007).

3) Torres Rivera, op. cit., pág. 187. Coincidimos con Torres Rivera, citando al Ledo. Román Velazco, ex Secretario del Departamento del Trabajo y Recursos Hu-manos, en cuanto a que
"... [l]a prohibición de despido injustificado, per se, no convierte al árbitro en un juez que adjudica una querella al amparo de la Ley 80. El hecho de que se le exija que resuelva conforme a derecho solo atañe al análisis que debe hacerse sobre la naturaleza justificada o injustificada del despido y no al remedio de restitución, que emana directamente de una conclusión de arbitrariedad e injustificabilidad del despido. Existe una clara diferencia cualitativa entre ambos conceptos. Decidir lo contrario a las normas que rigen el concepto de justa causa atenta contra éstas direc-tamente, mientras que el asunto remedial que nosr atañe, lejos de atentar contra el concepto justa causa, lo implementay viabiliza.” (Enfasis en el original suprimido y énfasis suplido.) Torres Rivera, op. cit., pág. 187.

 J.R.T. v. Vigilantes, Inc., supra, págs. 594-595. Véase, además, Nazario v. Tribunal Superior, supra, págs. 849-853.

 Fernández Quiñones, El arbitraje obrero-patronal, op. cit., pág. 217. Sobre este particular, el Tribunal Supremo de Estados Unidos ha especificado siete crite-rios para que los árbitros puedan determinar si en una acción de despido existe justa causa. Estos factores son: (1) la razonabilidad de la versión del patrono; (2) la noti-ficación dada al empleado, (3) cuán apropiado fue el momento en que se llevó a cabo la investigación; (4) si la investigación fue justa (fair); (5) la evidencia acumulada contra el empleado; y (7) la relación entre el grado de la medida disciplinaria y la naturaleza de la falta con el expediente de trabajo del empleado. Paperworkers v. Misco, Inc., 484 U.S. 29, 34 esc. 5 (1987).

 Fernández Quiñones, Análisis del Término 2006-2007 Tribunal Supremo de Puerto Rico: Derecho Laboral, supra.

 Elkouri y Elkouri, op. cit, págs. 930-931.

 R.J. Schoonhoven (editor), Fairweather’s Practice and Procedure in Labor Arbitration, 4ta ed., The Bureau of National Affairs, Inc., Washington, D.C., 1999, pág. 455.

 M.S. West The Case Against Reinstatement in Wrongful Discharge, 1988 (Núm. 1) U. Ill. L. Rev. 1, 22, esc. 111, citando a Elkouri y Elkouri, op. cit, 4ta ed., 1985, pág. 652.

 n Brand, Discipline and Discharge in Arbitration, Arlington, BNA Books, 2008, pág. 29 et seq.

 “Si el árbitro determina que el patrono carecía de justa causa para el despido, procederá a diseñar el remedio adecuado. La reinstalación del empleado ha sido el remedio común y más usado por los árbitros en casos de arbitraje laboral por despido ilegal." (Énfasis suplido.) Fernández Quiñones, El arbitraje obrero-patronal, op. cit., pág. 221, citando a Dallas L. Jones, Ramifications of Back-Pay Awards Discharge Cases, 22 National Academy of Arbitrators 163, 163-164 (1970). Véase, además, Departamento del Trabajo y Recursos Humanos, Guía para la interpretación y aplicación de la Ley Núm. 80, aprobada el 30 de mayo de 1976, op. cit., pág. 22, donde se establece que “[e]l remedio de la reposición o restitución en el empleo sola-mente está disponible ... o cuando el mismo surge de un convenio colectivo”.

 Schoonhoven, op. cit., pág. 455.

 íd., pág. 583.

 Brand, op. cit., pag, 462, citando a 95 LA (Labor Arbitration Report) 500, 508 (Jones, 1990).

 Brand, op, cit., pág. 369, citando a W.C. Nabors Co. v. N.L.R.B., 323 F.2d 686 (5to Cir. 1963).

 Brand, op. cit., pág. 469.

 íd., págs. 469-470. Para colocar al empleado en su condición anterior, los árbitros pueden ser creativos y tomar acciones remediales: “restore the status quo ante, including expunging the employee’s record, restoring seniority, awarding bonuses, wage increases and overtime pay, vacation, holiday and leave credits, and pension and welfare benefits.” íd., pág. 470.

 Schoonhoven, op. cit, págs. 458-459.

 Fernández Quiñones, El arbitraje obrero-patronal, op.cit., pág. 222, citando Golden State Bottling Co. v. N.L.R.B., 414 U.S. 168, 188 (1973); N.L.R.B. v. J.H. Rutter Mfg. Co., 396 U.S. 258, 263 (1969).

 Al respecto, el estatuto dispone que “[s]erá práctica ilícita del trabajo el que un patrono, actuando individualmente o concertadamente con otros ... [v]iole los términos de un convenio colectivo ...”. 29 L.P.R.A. sec. 69(l)(f).

 Esto siempre que no esté expresamente prohibido por el convenio colectivo o el pacto de sumisión.

 En una ocasión previa en que este Tribunal tuvo ante sí una controversia como la que nos ocupa, emitimos una sentencia para confirmar el laudo que repuso en su empleo al trabajador y ordenó el pago del salario adeudado. Esta determina-ción se dio en el contexto de un convenio colectivo que le requería al árbitro resolver conforme a derecho y disponía que los despidos fueran justificados, y ante un pacto de sumisión que le requería al árbitro proveer “el remedio adecuado”. H.I.E.Tel. v. Celulares, supra. Se emitieron dos opiniones de conformidad. Una, suscrita por la Juez Asociada Señora Rodríguez Rodríguez, a la cual se unió el Juez Presidente Señor Hernández Denton y el fenecido Juez Asociado Señor Fuster Berlingeri, en la que se entendió que el requisito de emitir un laudo conforme a derecho puede limitar la facultad del árbitro al remedio provisto por la Ley Núm. 80 si el convenio no provee el remedio de reinstalación ni requiere que el despido sea justificado. Al analizar las cláusulas del convenio, esta opinión de conformidad concluyó que las partes le habían otorgado al árbitro la facultad de conceder el remedio más abarca-dor de reposición con paga porque en dos secciones del convenio, respecto al plan médico y las cuotas a la unión, se hacía referencia a esta potestad. La segunda opinión de conformidad, suscrita por el Juez Asociado Señor Rebollo López, a la cual se unió la Jueza Asociada Señora Fiol Matta, sostuvo que el término “conforme a derecho” no limita la autoridad que tiene el árbitro para diseñar remedios. En otras *385 palabras, que la frase “conforme a derecho” no implica que el único remedio a conce-der se será el contenido en la Ley Núm. 80.

 Artículo VIII: Antigüedad, Convenio Colectivo entre Confederación de Or-ganizadores de Puerto Rico y Servidores Públicos Unidos de Puerto Rico/Concilio 95/AFSCME, AFLCIO, pág. 9; Artículo IX: Prerrogativas Gerenciales, Convenio Co-lectivo entre Confederación de Organizadores de Puerto Rico y Servidores Públicos Unidos de Puerto Rico/Concilio 95/AFSCME, AFLCIO, pág. 11.